243 N.J. Super. 232 (1990)
579 A.2d 316
RAN-DAV'S COUNTY KOSHER, INC., A NEW JERSEY CORPORATION T/A COUNTY KOSHER: ARTHUR WEISMAN AND NADINE WEISMAN, INDIVIDUALLY AND AS OFFICERS AND SHAREHOLDERS OF RAN-DAV'S COUNTY KOSHER, INC.; AND NEW JERSEY ALLIANCE OF KOSHER CATERERS, PLAINTIFFS-APPELLANTS,
v.
STATE OF NEW JERSEY: PETER N. PERRETTI, JR.; JAMES J. BARRY, JR.; RABBI YAKOV M. DOMBROFF; ATTORNEY GENERAL'S ADVISORY COUNCIL ON KOSHER FOOD; MORRIS GLATT; DIANE LAMONACO; AND DOES 1-50, DEFENDANTS-RESPONDENTS.[1]
Superior Court of New Jersey, Appellate Division.
Argued June 13, 1990.
Decided August 6, 1990.
*235 Before Judges DREIER, SCALERA and D'ANNUNZIO.
Eric L. Chase argued the cause for appellants (Margolis Chase, attorneys, Eric L. Chase and Genevieve K. LaRobardier on the brief, Laurence H. Tribe and Brian Koukoutchos, on the Supplemental brief).
John T. Ambrosio, Deputy Attorney General argued the cause for respondents (Robert Del Tufo, Attorney General, Andrea M. Silkowitz, Assistant Attorney General, of counsel, John T. Ambrosio and Nancy Costello Miller, on the brief).
Nathan Lewin argued the cause amicus curiae for the National Jewish Commission on Law and Public Affairs (Dennis Rapps, attorney, Barbara L. Newman, on the brief).
Bruce D. Shoulson argued the cause amicus curiae for The New Jersey Association of Reform Rabbis, The Reconstructionist Rabbinical Association, The New Jersey Region of the Rabbinical Assembly, and The Rabbinical Council of New Jersey (Lowenstein, Sandler, Kohl, Fisher & Boylan, attorneys, Walter A. Effross, on the brief).
Ronald K. Chen argued the cause amicus curiae for the American Civil Liberties Union of New Jersey (Deborah Ellis, of counsel and on the brief).
*236 Meyer L. Rosenthal argued the cause amicus curiae for the Anti-Defamation League of B'nai B'rith (Richard E. Shevitz, attorney; Meyer L. Rosenthal, on the brief).
Ronna D. Brown, Assistant Attorney General argued the cause amicus curiae for the Bureau of Consumer Frauds and Protection of the State of New York (Robert Abrams, Attorney General of the State of New York, attorney, John W. Corwin, Assistant Attorney General, in charge, Mary Hilgeman, Ronna D. Brown and Earl S. Roberts, of counsel, Robert Abrams, on the brief).
The opinion of the court was delivered by DREIER, J.A.D.
After dismissal of various claims in the Chancery Division, appellants Ran-Dav's County Kosher, Inc. and its principals (plaintiffs) here present a challenge to N.J.A.C. 13:45A-21.1 et seq., the New Jersey Kosher regulations. Plaintiffs have also challenged the parallel disorderly persons statute, N.J.S.A. 2C:21-7.2 et seq.; but since plaintiffs have not been charged with a violation of the disorderly persons statute, they have no basis for a direct attack in this proceeding.[2]
The action commenced when the Attorney General filed a complaint against plaintiffs, Ran-Dav's County Kosher Inc. and *237 Arthur Weisman, one of Ran-Dav's principals, alleging various violations of the Kosher food requirements set forth in the challenged regulations. These included possession of certain "Shelat" chicken breasts (determined to be non-Kosher by an out-of-state authority), and various specifications of the improper handling or packaging of purportedly Kosher meats. At the State's request, the Chancery Division entered an order requiring Ran-Dav's and Weisman to show cause why Ran-Dav's should not be preliminarily enjoined from holding itself out as an establishment selling Kosher food.
Defendants answered each allegation of the complaint. They defended in part by claiming that the regulations were unconstitutional, and by demanding an injunction against their enforcement. Ran-Dav's and Weisman obtained their own order directing the Attorney General to show cause why he should not be restrained from enforcing the regulations. They then filed counterclaims seeking a declaration of unconstitutionality, an injunction against enforcement, and damages suffered as a result of the enforcement of the regulations and allegedly defamatory press releases. The Attorney General moved to dismiss these counterclaims.
The trial judge denied the Attorney General's application for summary relief and both parties' applications for preliminary injunctions. Although jurisdiction of the enforcement actions was retained, the Chancery judge determined that the challenge to the regulations was properly a matter to be heard by the Appellate Division. The counterclaim was thus dismissed,[3] and this appeal was taken.
*238 Plaintiffs (hereafter referred to as "County Kosher" or "Weisman") are the owners and operators of a Kosher food business in Linden. As such, they are subject to regulation both privately, through religious rabbinical supervision provided by Rabbi Harry Cohen of New York, and civilly, by the State's Bureau of Kosher Enforcement in the Division of Community Affairs, directed by its Chief, Rabbi Yakov M. Dombroff.
The regulations' basic operative provision declares it to be "an unlawful consumer practice" to sell or attempt to sell food "which is falsely represented to be Kosher." N.J.A.C. 13:45A-21.2. They are designed to insure that food represented to be "Kosher" is in fact "Kosher." The challenged regulations define "Kosher" as food "prepared and maintained in strict compliance with the laws and customs of the Orthodox Jewish religion." N.J.A.C. 13:45A-21.1.[4] "Kosher-style" or similar words are defined in the regulations as meaning, inter alia, a non-Kosher food or product that simulates the taste, appearance and/or consistency of a Kosher food or product but "which has not been prepared or maintained in strict compliance with the laws and customs which are generally recognized as being among the Orthodox Jewish religious requirements." Such "Orthodox Jewish religious requirements" are nowhere spelled out with respect to stores which sell solely Kosher products.[5]
*239 Plaintiffs' principal claim is that the regulations violate the Establishment Clause of the First Amendment of the United States Constitution ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof"), and the coordinate provision of the N.J. Const. (1947), Art. I, par. 4 ("There shall be no establishment of one religious sect in preference to another...."). Plaintiffs assert that so long as they have conformed to the Kosher standards established by their supervising rabbi, the State is without authority to establish different religious standards to which plaintiffs must conform.
The State contends that the Jewish Kosher standards are recognized with little dissent by all branches of Judaism as being those developed and codified in the Orthodox tradition, and that by holding itself out as a purveyor of Kosher food, County Kosher represents to the public that it conforms to these standards. If it does not, the State has an obligation to protect consumers from such misrepresentation, and therefore the Kosher regulations have a valid secular purpose.[6]
In order to enforce the regulations, the Attorney General has created the Bureau of Kosher Enforcement within the Division of Consumer Affairs. Its present chief is a rabbi, Rabbi Dombroff, who employs several inspectors on his staff. The *240 inspectors are not rabbis, and some are not even Jewish. We have been advised that the former chief was not a rabbi. In addition, the Attorney General promulgated Executive Directive No. 1987-2 creating a "State Kosher Advisory Committee." The Committee consists of ten members appointed by the Attorney General, and its task is to "advise the Attorney General on Kosher matters and enforcement of the New Jersey Kosher regulations ... and make recommendations for regulatory changes." We are advised that all of the committee members are rabbis, one Conservative and the rest Orthodox.
As to the meaning of the word "Kosher," "[t]he Hebrew term is kashrut, which ... [means] "fit" or "proper." The word appears in the Bible only three times ... and even then not in connection with food." Encyclopaedia Judaica, Vol. 6 at p. 26. Herman Wouk in his biographical/philosophical work, This Is My God (Doubleday & Company, Inc. 1961) at pp. 130-131 writes:
The concept [of Kosher] is in all truth a hard one to pin down. "Kosher" is a late Hebrew word that does not occur in the books of Moses. Perhaps the nearest English word is "fit," in the sense of proper or suitable. But the fitness, it must be clear, is mostly ceremonial. Kosher preparation of food does result in a high degree of hygienic fitness. But a hog could be raised in an incubator on antibiotics, bathed daily, slaughtered in a hospital operating room, and its carcass sterilized by ultra-violet rays, without rendering kosher the pork chops that it yields.
For an understanding of the State's and plaintiffs' respective claims, we must briefly explain some of the basic laws of Kashrut, apparently accepted by all parties in this case. After doing so, we will also briefly describe the specific allegations against plaintiffs.
Although the word "Kosher" may not originally have applied to food or diet, for hundreds of years it has been understood to refer at least in part to the system of Jewish dietary laws.[7] Those laws set forth the rules of "(1) permitted and forbidden *241 animals, (2) forbidden parts of otherwise permitted animals, (3) the method of slaughtering and preparing permitted animals, (4) forbidden food mixtures, and (5) proportions of food mixtures prohibited ab initio but permitted ex post facto." Encyclopedia of Religion, Volume VIII, p. 270-271 (MacMillan Publishing Company 1987). Encyclopaedia Judaica states that "[t]he dietary laws are exceedingly complex and a great deal of material in the Talmud[8] is devoted to them." Id. at 40. The historical development of the religious laws of Kosher appears to have led to unaniminity (or at least near unaniminity) of opinion as to whether the majority of food and food preparations encountered in modern, everyday life are Kosher. There are, however, ongoing disputes over a variety of foods. Certain fish,[9] birds, hard cheeses, and wines are accepted by the *242 Conservative movement and a few Orthodox scholars, but rejected by the majority of the observant Orthodox. The Reform and Reconstructionist movements have institutionally not taken a position on the Kosher nature of particular food, since such ritual observance is not required and is left to individual choice.
The laws relating to the ritual slaughter of meat are "[s]o complex and minute ... that the slaughter must be carried out by a carefully trained and licensed shohet." (Encyclopaedia Judaica, supra, at p. 28). Compliance with the rules "is highly labor intensive" and causes the price of Kosher food to be "consistently higher" than its non-Kosher counterparts." ("Shopping Guide for the Kosher Consumer," published by the New York State Consumer Protection Board). Also, the laws concerning preparation of meat are detailed. Meat requires "Koshering" to draw out all blood, since the consumption of blood is forbidden in the Bible. (Lev. 7:26-27; 17:10-14). Meat must be soaked and salted (the timing of the salting process and the texture of the salt is specified), and then left to stand, followed by additional washings. If more than 72 hours had elapsed since slaughter, the blood can be removed only by roasting over an open flame. (Encyclopaedia Judaica, supra, at p. 28).
The investigators employed by the Bureau of Kosher Enforcement in the Division of Consumer Affairs inspected plaintiffs' place of business on five occasions and noted specific violations. The first alleged violation involved the deveining of calf tongues. The inspector found calves' tongues in a brine solution in a refrigerator. Plaintiffs contended that 25 to 30 tongues were being cleansed in a mild brine solution prior to deveining and prior to pickeling by injection of full-strength brine. The inspector contended that there were even a larger number of tongues in a metal container, and that they were already in a full-strength brine solution without having been deveined. Both parties agree that deveining was required, and the State agrees that pre-soaking in a mild brine solution, if *243 acceptable to the establishment's supervising rabbi, would not be a basis for a violation notice.
The second charge involved the presence of Shelat brand boned chicken breasts, six boxes of which were found in the bottom of a storage freezer. Plaintiffs had been notified that certain Shelat products were no longer considered Kosher as a result of out-of-state inspections. Plaintiffs contended that these boxes were merely being held for return to the supplier.[10]
The third problem, which the State claims occurred on two dates, involved finding blood and a vein in meat to be ground for hamburger. Plaintiffs explained that the meat was defrosting and had not yet been trimmed to remove any veins or blood. Only then would it be ground.
The next problem involved labeling. The inspector found approximately 10 packages (out of 1,750 packages) with labels showing the meat had been packaged prior to the 72 hour period required for rewashing. Plaintiffs contended that some of the packages had been sold earlier, but the customer had not yet picked them up. Insofar as the packages contained veal, the veal labeling and dating machine was broken, and was incorrectly labeling the packages. The balance of the items were prepackaged Kosher briskets purchased from a third party so that the labeling was irrelevant.[11]
*244 As can be seen, the issues in the parallel enforcement proceedings do not involve doctrinal disputes concerning interpretations of Jewish law to determine what is Kosher. What is involved is akin to a claim by the State of fraud or mistake and denials by plaintiffs. For example, if plaintiffs, knowing that the Shelat chickens were not Kosher, were holding them for sale to consumers, such actions would have justified a claim of consumer fraud, irrespective of any variant interpretations of what is Kosher. Similarly, if the untrimmed meat, complete with veins and blood, was either intentionally or negligently to be thrown into the grinder, even plaintiffs do not contend that the resultant product would have been properly labeled. They claim, however, that the inspector failed to recognize that this meat was being held to be trimmed, not to be ground.
Yet plaintiffs still challenge the regulations. They claim that the Kosher determination is to be made by their supervising rabbi[12] and, since the determination is solely a matter of interpretation of religious law, the State may not adopt or establish a religious standard further to assess their actions. Especially, the State may not adopt what it considers to be a singular "Orthodox Jewish" standard. Since it is clear that the State's specific claims of violations do not implicate a challenge to plaintiffs' supervising rabbi's interpretation of "what is Kosher," plaintiffs' challenge to the regulations must be viewed as facial.
*245 We can consider this attack in several ways. The State suggests we employ a test under which we would be required to uphold the regulations unless we find that "no set of circumstances exists under which the [regulations] would be valid." Webster v. Reproductive Health Services, 492 U.S. ___, ___, 109 S.Ct. 3040, 106 L.Ed.2d 410, 439 (1989) (O'Connor, J., concurring). We disagree with the test suggested by the State; although the State claims facial validity applying the Webster standard, we note that Justice O'Connor herself stated that this standard is inapplicable in the "context of the First Amendment." 492 U.S. at ___, 109 S.Ct. at 3060, 106 L.Ed.2d at 440. Since the regulations clearly could prohibit the sale of pork, or chickens not slaughtered in accordance with any semblance of adherence to religious practices, deceptively mislabeled "Kosher," the law at least has some facial validity. Hygrade Provision Co. v. Sherman, 266 U.S. 497, 45 S.Ct. 141, 69 L.Ed. 402 (1925).[13]
Plaintiffs present the mirror image of the State's argument. They contend that since there are conceivable circumstances under which the regulations cannot constitutionally be applied, they should be overturned by this court. If "the enactment reaches a substantial amount of constitutionally protected conduct," it is overbroad. Town Tobacconist v. Kimmelman, 94 N.J. 85, 98, 462 A.2d 573 (1983), quoting Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 494-495, 102 S.Ct. 1186, 1191-1192, 71 L.Ed.2d 362, 369 (1982). Plaintiffs' argument also implicates the consideration of vagueness. If the phrase "prepared and maintained in strict compliance with the laws and customs of the Orthodox Jewish religion," establishes a standard that is not readily determinable, *246 there might be a valid challenge to the clarity of the regulations.
The Attorney General has met plaintiffs' overbreadth and vagueness claims by acknowledging in his brief
that, where Orthodox Jewish authorities dispute the force or requirement of a particular definition of kosher, the State is precluded from choosing one interpretation over the other.
The Attorney General thus concedes that this court should construe the regulations "to avoid questions of religious entanglement," and agrees that the regulations are not violated where there is a dispute among accepted Orthodox Jewish authorities and the seller has complied with either interpretation. At oral argument we carefully explored this contention. The Attorney General (over the objections of the amici curiae who had otherwise argued in favor of the State's position) explicitly conceded that the phrase "strict compliance with the laws and customs of the Orthodox Jewish religion" is construed by the Attorney General's office as validating any bonafide or sincerely held belief by the purveyor that the item was in fact Kosher.[14] It is actually somewhat disingenuous for plaintiffs to say that "Kosher" is an indefinite term. They hold themselves out to the community as purveyors of "Kosher" food. They know that their many customers rely upon them and their *247 supervising rabbi to be knowledgeable concerning the various requirements to designate their products as "Kosher" within the generally-accepted meaning of the word. See Hygrade Provision Co. v. Sherman, supra, 266 U.S. at 501-502, 45 S.Ct. at 142-143, 69 L.Ed. at 407.
We accept the State's interpretation as reflecting the enforcement policy in effect, and will later explore the question of whether this interpretation removes any question of religious entanglement from the enforcement of these regulations. We first, however, will treat the arguments of the amici who, after hearing the State's concessions, departed from their concurrence with the State over this issue. Since these regulations are aimed at consumer protection, their principal concern was that the consumer expects that the products will conform to a generally-accepted standard of Kosher, not a private standard determined by a single variant rabbi. This argument has some facial merit, but it also contains the elements of its own refutation. As will be discussed, and as the State has wisely noted, consumer protection in this instance is to be balanced against the possible excessive entanglement of the State in a religious determination. As soon as the State injects itself into determining what is the commonly-held standard of Kosher, it determines what essentially is a religious issue. It is not enough to say that the religious protection is for the potential buyer only. It is as much a religious issue for the party selling the product (who has a right to a livelihood which may include the sale of Kosher products, so long as he does not intentionally or negligently defraud the public), as it is for the consumer who wishes to purchase a Kosher product.
We recognize that there are basically three groups who purchase Kosher products. First, there are the observant Jews who wish to comply with their religion. Second, there are members of other religions or persons with health problems who rely upon the fact that the commonly-known bases of the Kosher designation will be observed. For example, Moslems buy Kosher products because they know that they will not *248 contain pork products; people with shellfish allergies can buy Kosher products because they know that shellfish are not Kosher. Lastly, there are members of the general public who have a notion that the Kosher processes of meat preparation are under closer scrutiny than are those of the general producer, since they are supervised by State and federal health authorities as well as rabbinic personnel. In fact, general advertisement for some Kosher products speak of the greater care taken in preparation of Kosher meats because of responsibility to "a Higher Authority." Even though we acknowledge some market created by the second two groups of customers, the primary market, at least for non-mass-produced items, is comprised of observant Jews. If a supplier's practices diverge from the norm, there are immediate bulletins issued by various congregations, news services, magazines and the like to inform observant Jews that a particular manufacturer's products are questionable. Most suppliers would not risk such deviation for fear of losing this substantial market. While there is the remote possibility of an outlandish enforcement ruling ("Kosher" pork), its regulation should be left to the later case in which it may arise.
The second self-regulating factor is the presence of large certifying organizations who inspect in addition to the particular supervising rabbi, or out of respect for the supervising rabbi on the basis of his certification, will endorse the product as conforming to religious standards. In addition to a simple letter "K" which merely notes some Kosher supervision, there are at least eight other copyrighted symbols to show supervision.[15]
*249 The consuming public is thus not left at a loss. Between the diligence of local congregations and their rabbis, and the national or regional agencies that supervise compliance, the State's regulatory acceptance of a good-faith divergence from the Kosher norm, with its attendant publicity, is unlikely to have any great effect. The sale of Kosher products is largely self-regulated within the community.
If we accept the State's interpretation of the "strict compliance with laws and customs of the Orthodox Jewish religion" as permitting strict compliance with any sincerely held interpretation of the laws and customs of the Orthodox Jewish religion, we then must determine whether this interpretation violates the First Amendment to the United States Constitution or N.J. Const. (1947), Art. I, par. 4. The Supreme Court in Lemon v. Kurtzman, 403 U.S. 602, 612-613, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745, 755 (1971), established a three-pronged test to determine whether a challenged activity violates the religion clauses of the First Amendment. All of the parties concede that this test is applicable to the issues before us. However, the ACLU in its amicus brief suggests that the express adoption in the New Jersey Kosher regulations of the laws and customs of the "Orthodox Jewish religion" constitutes a per se violation of the United States and New Jersey Constitutions. The ACLU argues from Larson v. Valente, 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982), and Hernandez v. Commissioner, 490 U.S. 680, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989), that the mere expression of the denominational preference is dispositive of the issue. The Supreme Court stated in Hernandez that
when it is claimed that a denominational preference exists, the initial inquiry is whether the law facially differentiates among religions.
Also,
If no such facial preference exists, we proceed to apply the customary three-pronged ... inquiry derived from Lemon. [490 U.S. at ___, 109 S.Ct. at 2146, 104 L.Ed.2d at 784].
*250 Where a standard is not religious, the State may establish it; but where a standard is solely one of religious law, the State may not prefer one religious interpretation over another. Tudor v. Bd. of Education, Rutherford, 14 N.J. 31, 44, 100 A.2d 857 (1953), cert. den. sub nom. Gideons International v. Tudor, 348 U.S. 816, 75 S.Ct. 25, 99 L.Ed. 644 (1954). If each of the branches of Judaism had different Kosher standards and the regulations adopted the Orthodox standards, the ACLU's position would have been well taken. As noted earlier, however, the Reform and Reconstructionist branches have no Kosher requirements, and leave adherence to those who wish to be observant of the Kosher laws. The standard, according to the brief and arguments of the rabinical association of all four branches of Judaism, is the Orthodox formulation.
Some Conservative and some divergent Orthodox interpretations do present small variations from the mainstream, but they do not pretend to be adopting different standards; they merely advance their interpretations of the same Orthodox standards. Thus, if one of these groups advocates that pheasant and swordfish are Kosher, or that caviar (as the roe of sturgeon) may be eaten, they do so by first applying the Orthodox standards, and then interpreting them differently. If the State attempted to hold these groups to the majority Orthodox interpretation, we might have some disagreement; but since the State has conceded far more than would be required to support these minor variations, we see no basis for a Larson/Hernandez attack.
The three part Lemon v. Kurtzman test states:
First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion, .. . finally, the statute must not foster `an excessive government entanglement with religion.' [403 U.S. at 612-613, 91 S.Ct. at 2111, 29 L.Ed.2d at 755; quoting from Walz v. Tax Commission, 397 U.S. 664, 674, 90 S.Ct. 1409, 1414, 25 L.Ed.2d 697, 704 (1970)].
These tests have been applied to First Amendment religion cases from the time they were announced in 1971 to date. See e.g., Board of Education, Westside Community Schools v. *251 Mergens, ___ U.S. ___, 110 S.Ct. 2356, 110, L.Ed.2d 191 (1990). We will examine each aspect.
First, it is clear that there is a secular legislative purpose, viz, the protection against intentional and negligent misrepresentation in the sale of Kosher food. Given the various reasons discussed earlier for the purchase of Kosher foods, and the tremendous profit that could be made by palming off non-Kosher food as Kosher, the secular purpose test is met. The purpose of these regulations is not merely "to endorse or disapprove of religion." Wallace v. Jaffree, 472 U.S. 38, 56, 105 S.Ct. 2479, 2489, 86 L.Ed.2d 29, 43 (1985) (overturning Alabama's period of silence statute, because the legislative history demonstrated that there was no secular purpose and that it was intended to return prayer to the classroom). The fact that the Kosher statute coincides with religious beliefs and "incidentally" benefits religious organizations is not enough to outweigh the regulations' compliance with the secular purpose prong of the Lemon tests. See Widmar v. Vincent, 454 U.S. 263, 273-274, 102 S.Ct. 269, 70 L.Ed.2d 440, 450 (1981). In fact, the regulations themselves note that the purpose of the regulation was to "protect the consumer who, for reasons of religion, conscience, quality or health, intends to purchase Kosher foods." 16 N.J.R. 220(a) (1984).
Even if we were to consider that the primary purpose is to protect observant Jewish consumers, it is clear that this regulation is not one to establish religion, but rather to accommodate those who are practicing their religion. This distinction was made clear in Jones v. Butz, 374 F. Supp. 1284 (S.D.N.Y. 1974), aff'd 419 U.S. 806, 95 S.Ct. 22, 42 L.Ed.2d 36 (1974), where the court upheld the exception for Kosher slaughterers from the general requirements of the Humane Slaughter Act. And see Zorach v. Clauson, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952), upholding a New York "released time" statute permitting public schools to release students to "go to religious centers for religious instruction or devotional exercises." Justice Douglas there noted that Church and State need not be *252 "aliens" to each other, but only that there shall not be a "dependency one on the other." 343 U.S. at 312, 72 S.Ct. at 683, 96 L.Ed. at 961. Similarly, in Board of Education, Westside Community Schools v. Mergens, supra, the Supreme Court noted that government may accommodate religious groups to permit meetings in schools provided they are not a subterfuge for the establishment of any particular religion.
In the case before us, if observant Jews' access to Kosher food requires special protection against fraud, the State can accommodate religion and provide such protection. As was stated in Zorach v. Clauson, involving the released time statute, the State could properly respect "the religious nature of our people and [accommodate] the public service to their spiritual needs." 343 U.S. at 314, 72 S.Ct. at 684, 96 L.Ed. at 962.[16] Here, there is no endorsement of the observance of the Kosher regulations by any person, nor is there any significant burden placed upon the non-observant. The prevention of fraud to any segment of the population, however defined, benefits all.
The second prong of the Lemon test requires that the regulation's principal or primary effect must neither advance nor inhibit religion. The parties and amici have not urged a violation of this prong of the test. We only note that New York's 75-year experience with a similar statute has shown no unwarranted effect, either establishing religion in general, or *253 Orthodox Judaism in particular.[17]
The principal Lemon issue is whether the Kosher regulations foster an excessive government entanglement with religion. Historically, as noted in Tribe, American Constitutional Law, (1978) § 14-3 at 816-817, Roger Williams was concerned about the State corrupting religion; Thomas Jefferson was concerned about protecting the State from religion, and therefore advocated the strictest wall of separation; and James Madison saw both Church and State as posing mutual threats, with experience showing that the State, as in the England of his day, could permit one sect to gain control over others. Plaintiffs and the ACLU draw on this background and assert that the regulations before us permit courts to resolve disputes over sincerely held religious beliefs. Historically, New Jersey courts have abstained from such decisions. See Chavis v. Rowe, 93 N.J. 103, 109-110, 459 A.2d 674 (1983). And see Tudor v. Bd. of Education, Rutherford, supra, 14 N.J. at 36-44, 100 A.2d 857, where Chief Justice Vanderbilt traced the history of the American doctrine of the separation of Church and State. He also noted the concurrence of the New Jersey constitutional provisions with the First Amendment to the Federal Constitution. Id. at 44, 100 A.2d 857.
Plaintiffs contend that since the regulations are now enforced by an Orthodox Jewish rabbi, and the regulations are interpreted by an Advisory Council consisting of all Orthodox rabbis (except for one Conservative member), the regulations are unconstitutional. They rely upon Larkin v. Grendel's Den, Inc., 459 U.S. 116, 103 S.Ct. 505, 74 L.Ed.2d 297 (1982), which we find has no application to the matter before us. There a *254 zoning statute permitted church governing bodies to veto liquor license applications. The statute was overturned, since government may not delegate its decision-making function to a religious body. 459 U.S. at 127, 103 S.Ct. at 512, 74 L.Ed.2d at 307. And see Spacco v. Bridgewater School Dept., 722 F. Supp. 834 (D.Mass. 1989), where the lessor-church was given the power to influence elementary school curriculum in space leased from its parish center.
In the case before us, however, Rabbi Dombroff does not hold his office by virtue of his rabbinical training or ordination. He is a State employee. Whatever may be his personal beliefs concerning what is or is not religiously proper Kosher practice, according to the State he may not reject any practice which is supported by the sincerely held belief of the purveyor that the product is Kosher. The State thus has not delegated to Rabbi Dombroff or the Advisory Council the power to determine what is or is not religiously Kosher. By virtue of Rabbi Dombroff's training, however, he is able to determine what the norm is and, as noted earlier, there are few disputes concerning what is or is not Kosher. The issues he faces involve whether acknowledged Kosher requirements have in fact been met.[18] We see no basis here for plaintiffs' apprehension *255 that the Orthodox establishment is here attempting to use the State to wage sectarian warfare. The State may not use its powers to punish a person who merely has religious doctrinal disagreements with any established religion.[19]
Plaintiffs also contend that if the regulations are upheld, the Attorney General or the courts will be drawn into resolving religious disputes. We disagree. We state clearly and unequivocally that the State cannot and will not resolve whether any person's religious tenet is true, or even whether it is correct within the bounds of the person's own organized religion. These issues are left for religious determination, if an acceptable forum exists to determine the issue. The forum, however, is not supplied by the State except in the most unusual circumstances. Hardwick v. First Baptist Church of Perth Amboy, 217 N.J. Super. 85, 91-93, 524 A.2d 1298 (App. Div. 1987).
Under the State's broad interpretation of the regulations, the only remaining issue would be whether the variant practice was supported by the purveyor's good-faith belief that the item complied with the Kosher laws. Such an interpretation would not run afoul of United States v. Ballard, 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148 (1944), where Justice Douglas reiterated that "`[t]he law knows no heresy, and is committed to the support of no dogma, the establishment of no sect.'" 322 U.S. at 86, 64 S.Ct. at 886, 88 L.Ed. at 1153. (quoting from Watson v. Jones, 13 Wall. (80 U.S.) 679, 728, 20 L.Ed. 666, 676). Justice Jackson's dissent in Ballard gives us some pause. There he argued that the indictment should have been dismissed because he did *256 not see how a court could separate "what is believed" from "what is believable." 322 U.S. at 92, 64 S.Ct. at 889, 88 L.Ed. at 1157. Yet, determining the bona fide nature of a person's belief is not foreign to the courts. It is found in the various conscientious objector adjudications. See United States v. Seeger, 380 U.S. 163, 165-166, 85 S.Ct. 850, 853-854, 13 L.Ed.2d 733, 737 (1965); Witmer v. United States, 348 U.S. 375, 382-383, 75 S.Ct. 392, 396-397, 99 L.Ed. 428, 434-435 (1955). Also, such a decision requires no subjective appraisal by the court. It is merely a determination of the existence of a state of mind, not its evaluation. As noted in the oft-cited quotation from Bowen, L.J. in Edgington v. Fitzmaurice, L.R. 29 C.D. 459, 483 (55 L.J.Ch. 650 1885), the "state of a man's mind is as much a fact as the state of his digestion." We reiterate that given the New York experience, we envision few if any cases where this issue will ever be adjudicated.
Plaintiffs argue that the State entangles itself in religion when it looks to an undefined body of Kosher law which is not spelled out in the regulations. This argument can be answered in two ways. First, plaintiffs have shown no dispute as to the interpretation of religious law. Second, the body of law is sufficiently definite that the reference is merely a shorthand for a known entity.
This issue has not presented a problem in the past. For example in Jones v. Butz, supra, 374 F. Supp. 1284 (S.D.N.Y. 1974), aff'd 419 U.S. 806, 95 S.Ct. 22, 42 L.Ed.2d 36 (1974), the incorporation by reference of the Kosher slaughtering regulations as an exemption to the Humane Slaughter Act did not require a specification of the religious regulations for slaughter. Furthermore, in Hygrade Provision Co. v. Sherman, supra, 266 U.S. 497, 45 S.Ct. 141, 69 L.Ed. 402 (1925), decided prior to the First Amendment being made applicable to the states, the word "Kosher" and the phrase "Orthodox Hebrew religious requirements" were found not to be unconstitutionally vague. In a libel setting, a contention that poultry was non-Kosher as held not to be impermissibly vague; the complaint, as *257 phrased, stated a cause of action. Cabinet v. Shapiro, 17 N.J. Super. 540, 547, 86 A.2d 314 (Law Div. 1952).[20] In short, we have found no authority for plaintiffs' claim that a reference to the religious Kosher laws is impermissibly vague so that the State must adjudicate a religious issue to determine the standard to which a party will be held.
Ordinarily, scienter is not an essential element of a claim brought pursuant to regulations promulgated under the Consumer Fraud Act. Fenwick v. Kay American Jeep, Inc., 72 N.J. 372, 378, 371 A.2d 13 (1977). Therefore both a knowing and a negligent violation of the regulations would be actionable. The penalty, however, might reflect this element as such. In the case before us we do not add a scienter element. Rather, the standard is defined by the good-faith belief of the seller, who is then held to that standard and may be subject to administrative regulation for the intentional or negligent deviation from such standard. We expect that little or no such adjustments from the generally-accepted Kosher rules will be needed. See Hygrade Provision Co. v. Sherman, supra. While Hygrade was decided in 1924, its logic is unassailable.
It thus appears that, whatever difficulty there may be in reaching a correct determination as to whether a given product is kosher, appellants are unduly apprehensive of the effect upon them and their business, of a wrong conclusion in that respect, since they are not required to act at their peril, but only to exercise their judgment in good faith, in order to avoid coming into conflict with the statutes. Indeed, putting the statutes aside, such judgment they would be bound to exercise upon ordinary principles of fair dealing. By engaging in the *258 business of selling kosher products they in effect assert an honest purpose to distinguish to the best of their judgment between what is and what is not kosher. The statutes require no more. Furthermore, the evidence, while conflicting, warrants the conclusion that the term `kosher' has a meaning well enough defined to enable one engaged in the trade to correctly apply it; at least, as a general thing. If exceptional cases may sometimes arise where opinions might differ, that is no more than is likely to occur, and does occur, in respect of many criminal statutes either upheld against attack or never assailed as indefinite. [266 U.S. at 501-502, 45 S.Ct. at 142-143, 69 L.Ed. at 407].
We have accepted several representations of the State, plaintiffs or amici. The State persuasively argues that not only should the regulations be interpreted to permit good-faith divergence, but they are in fact so interpreted. We accept the State's representation that even if a major issue arises in New Jersey the State will look only at whether the interpretation is in accordance with the purveyor's sincerely-held belief. We also have viewed the regulations against the New York Attorney General's representations concerning the New York experience, particularly that the issues that plaintiffs claim draw the regulations into question have not surfaced in a 75-year history of enforcement. We further accept the position of those amici who assert that the word "Kosher," as it is presently understood by all branches of Judaism, is a term that has grown out of Orthodox Jewish principles, and that the interpretation of what is Kosher is an interpretation of these Orthodox principles.[21]
By upholding but liberally reading these regulations, we follow the precept that a regulation or statute should not be declared unconstitutional if it can be interpreted constitutionally. New Jersey Bd. of Higher Ed. v. Shelton College, 90 N.J. 470, 478-479, 448 A.2d 988 (1982); 2A Sutherland, Statutory Construction (4th ed. 1984) § 45.11 at 46.
*259 Plaintiffs have raised numerous additional constitutional arguments which we have considered and determined to have no merit.
Since the State has acquiesced in the proposition that a good-faith determination by plaintiffs concerning the Kosher nature of their products will not be subject to challenge, we see no injustice in plaintiffs being required to explain in the pending enforcement action what may be no more than suspicious circumstances. The State of course has the burden of proving the violation. But the standards, as contained in the disputed regulations, as we interpret them, are constitutional. This matter is remanded to the Chancery Division for such further proceedings as may be appropriate.
D'ANNUNZIO, J.A.D. (dissenting).
In my opinion the regulations at issue violate all three prongs of the test synthesized in Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). Despite the attempts of respondents and their supporting amici to place a commercial spin on the preparation of kosher foods and, thereby, to justify State regulation of this "commerce," the laws of kashrut are laws of religious observance and ritual. As such, the State is prohibited by the Establishment Clause of the First Amendment to the United States Constitution from involvement in the definition and enforcement of the parameters of those religious practices even if we assume that currently there is a consensus within the Jewish community regarding them. See Abington School District v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (the Establishment Clause prohibits more than government preference of one religion over another, it also prohibits aid to any religion).
Respondents contend that the regulations' purpose is the prevention of fraud and, therefore, it meets Lemon's secular purpose prong. I reject this contention. It is too facile. Almost every attempt by the State to police religious practice can *260 be justified as a legitimate attempt to prevent fraud. Cf. Larson v. Valente, 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982) (exemption from financial reporting and registration requirements limited to religious organizations receiving more than 50% of their contributions from members violates the Establishment Clause). Thus, a consumer protection regulation prohibiting a church from designating itself as Christian unless it professes and teaches the divinity of Jesus Christ would not satisfy the first prong despite the avowed objective of preventing fraud. In the hypothetical example, the regulation's purpose is the codification of an element of religious dogma acceptable to the State or to those persons in a position to influence the State. In the present case, the kosher regulations achieve the same end though in a more prosaic context.
These considerations also persuade me that the regulations' primary effect is the advancement of religion by elevating the rules of kashrut to legal status, thereby violating Lemon's second prong.
Lemon's third prong is that the statute or regulation "must not foster an `excessive government entanglement with religion.'" Id., 403 U.S. at 613, 91 S.Ct. at 2111, quoting Walz v. Tax Commission, 397 U.S. 664, 674, 90 S.Ct. 1409, 1414, 25 L.Ed.2d 697 (1970). Lemon defined the test of excessive entanglement in the following terms:
In order to determine whether the government entanglement with religion is excessive, we must examine the character and purposes of the institutions that are benefitted, the nature of the aid that the State provides, and the resulting relationship between the government and the religious authority. Mr. Justice Harlan, in a separate opinion in Walz, supra, echoed the classic warning as to "programs, whose very nature is apt to entangle the state in details of administration...." Id., at 695 [90 S.Ct. at 1425]. [403 U.S. at 615, 91 S.Ct. at 2112.]
The State's Bureau of Kosher Enforcement is engaged in a comprehensive scheme of governmental enforcement of the religious laws of kashrut. Not only does the State presume to adopt a regulation defining those laws, it has also enacted detailed regulations regarding the preparation, handling, maintenance, *261 tagging and labeling of the product. Many of those detailed regulations are kashrut laws or derivatives. The State's chief enforcer is a rabbi and the State's advisory committee consists of ten rabbis. Thus, the State is heavily involved in the "details of administration." Walz, supra, 397 U.S. at 695, 90 S.Ct. at 1425 (Harlan, J., concurring). The regulatory scheme, therefore, involves the conferring of civil authority on clergymen for the superintendence and enforcement of religious ritual.
Of equal concern is the "divisive political potential" of the kosher enforcement program. Lemon, supra, 403 U.S. at 622, 91 S.Ct. at 2115. All regulations are subject to fine tuning and change through the exercise of political influence or power. This regulatory scheme is pregnant with the danger of political activism to foster sincerely held religious beliefs or, in light of the commercial potential of the kosher food industry, to advance economic interests. Whether the motive is conscience or greed, the result will be government involvement in religious competition and dispute. This potential was recognized recently as one to be avoided in Larkin v. Grendel's Den, Inc., 459 U.S. 116, 103 S.Ct. 505, 74 L.Ed.2d 297 (1982). In that case the Supreme Court invalidated a statute which gave church authorities the right to veto liquor license applications for any premises located within a radius of 500 feet of a church. The court stated:
Section 16C substitutes the unilateral and absolute power of a church for the reasoned decision-making of a public legislative body acting on evidence and guided by standards, on issues with significant economic and political implications. The challenged statute thus enmeshes churches in the processes of government and creates the danger of "[p]olitical fragmentation and divisiveness on religious lines," Lemon v. Kurtzman, supra, at 623, 29 LEd 2d 745, 91 S Ct 2105 [2116]. Ordinary human experience and a long line of cases teach that few entanglements could be more offensive to the spirit of the Constitution. [459 U.S. at 127, 103 S.Ct. at 512; footnote omitted.]
See Presbyterian Church v. Hull Church, 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969) (civil courts constitutionally incapable of resolving ecclesiastical question to decide property disputes).
*262 It may be contended that the regulatory scheme at issue is an innocuous and limited involvement of the State in the interests of consumer protection. That argument has particular appeal in light of the assumed absence of substantial differences at this time regarding the laws of kashrut. James Madison, in his Memorial and Remonstrance against Religious Assessments responded to that type of contention. He opposed a proposed Virginia tax assessment for the benefit of all religions in part
Because, it is proper to take alarm at the first experiment on our liberties. We hold this prudent jealousy to be the first duty of citizens, and one of [the] noblest characteristics of the late Revolution. The freemen of America did not wait till usurped power had strengthened itself by exercise, and entangled the question in precedents. They saw all the consequences in the principle, and they avoided the consequences by denying the principle. We revere this lesson too much, soon to forget it. Who does not see that the same authority which can establish Christianity, in exclusion of all other Religions, may establish with the same ease any particular sect of Christians, in exclusion of all other Sects? That the same authority which can force a citizen to contribute three pence only of his property for the support of any one establishment, may force him to conform to any other establishment in all cases whatsoever?[1]
I find no state interest sufficiently compelling to justify the extent of government entanglement in religious ritual authorized in this regulatory scheme. I concede that consumer protection is a legitimate government interest. But as the majority points out the Jewish community effectively self-regulates purveyors' adherence to the laws of kashrut.
Finally, I reject Hygrade Provision Co. v. Sherman, 266 U.S. 497, 45 S.Ct. 141, 69 L.Ed. 902 (1925) as precedent in support of respondents' position. Although Hygrade involved the enforceability of a New York statute enacted to prevent fraud in the sale of food marketed as kosher, the challenge was not based on the First Amendment. When the Court decided Hygrade it had not yet recognized the Establishment Clause's applicability to the states through the Fourteenth Amendment. *263 See Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). In Hygrade the statute was challenged on grounds of equal protection and due process and as contravening the Commerce Clause.
For the reasons stated above I would invalidate those parts of the regulatory scheme which involve the State in defining and enforcing religious ritual.
NOTES
[1] We have used the caption employed by the parties in the notice of appeal. As procedural history will show, the caption should have remained as in the original suit instituted by the Attorney General's Office.
[2] In their attempt to challenge N.J.S.A. 2C:21-7.2 et seq., plaintiffs requested a declaration that the Kosher violations sections of the disorderly persons statute were invalid. Procedurally, the trial court dismissed the claim, and we previously denied leave to appeal that dismissal. We now sustain the trial court's dismissal of this portion of the counterclaim. Plaintiffs' reliance on R. 2:10-5 is misplaced. That rule provides only that we "may exercise such original jurisdiction as is necessary to the complete determination of any matter on review." It is not necessary for us to review the disorderly persons sections in order to pass upon the constitutionality of the Kosher regulations. We are aware, however, that our decision concerning the constitutionality of N.J.A.C. 13:45A-21.1 et seq. could have a substantial stare decisis effect concerning the disorderly persons statute; but any explicit decision concerning the statute must await the proper case. Any references to the criminal statute therefore, shall be for informational purposes only.
[3] The correct procedure was not a dismissal, but rather a transfer of the action to the Appellate Division pursuant to R. 1:13-4(a). There is even a question whether the trial judge was required to transfer this action at all. See State v. Barcheski, 181 N.J. Super. 34, 37-38, 436 A.2d 550 (App.Div. 1981). However, the attacks on the facial validity of the regulations are on a legal basis only. They do not require the development of a factual record, and the matter has been fully briefed and argued before this court. Furthermore, since it is clear that either way the trial judge had determined the issue, an appeal would have been taken, it serves no principle of judicial economy for us to remand the matter for an initial determination of the legal issues by a trial judge. We therefore will accept and determine the issues before us as if the challenged claims had been transferred to this court.
[4] The parallel disorderly person's statute defines "Kosher" as "prepared under and maintained in strict compliance with the laws and customs of the Orthodox Jewish religion...." N.J.S.A. 2C:21-7.2d.
[5] Although the regulations, in general, simply incorporate the laws and customs of the Orthodox Jewish religion, where both Kosher and non-Kosher products are sold, N.J.A.C. 13:45A-21.3 establishes detailed requirements for display and handling, washing and deveining, and exterior signs; it also spells out in some detail the ways in which food or food products must be handled in order to retain their Kosher designation.
[6] We note an additional consumer protection statute, N.J.S.A. 56:8-2.10, concerning the misrepresentation of food or food products in a restaurant where food has been misidentified or fails to meet a standard of quality established by custom and usage. And see the Consumer Fraud Act, N.J.S.A. 56:8-2, declaring as an unlawful practice

any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise.
[7] There are other "Kosher" regulations, e.g., concerning the mixing of fabrics in the fashioning of clothing.
[8] The Talmud is a collection of the oral supplement to the Torah (first five books of the Bible), believed to have been given to Moses at Mt. Sinai; commentaries thereon nearly two thousand years old (compiled in the fourth and fifth century); and commentaries on the commentaries over the ensuing centuries. The form is often disputational, with unresolved contrary opinions stated by various rabbis. Horowitz, The Spirit of Jewish Law, (Bloch Publishing Co. 1953) at pp. 36-39. The Talmud includes both law ("Halakah") and story ("Hagadah"). In the 12th century the obscure Talmudic law, "Halakah," was codified by Maimonidies in the Mishneh Torah, followed in the 16th century by Rabbi Joseph Karo's codification of law and practice, the Shulhan'Aruk, and Rabbi Moses Isserles' adaptation of that work to Northern European practices. The codes are supplemented by "response," or rulings by rabbinic sages through the centuries. Id. at 40-41. It is this body of material (greatly simplified for this discussion), that provides the principal source of modern-day decisions on Orthodox and Conservative (and even some Reform and Reconstructionist) Jewish practices. Thus the law of Kosher, although derived originally from biblical statute, has been developed through rabbinic legislation and custom.
[9] For instance, there is an ongoing dispute as to whether swordfish is Kosher. The basic rule is that fish with at least two scales and one fin are Kosher. Some scholars are of the opinion that only the "sailfish," not the "swordfish," has scales and is therefore Kosher. On the other hand, other authorities, after consulting with the United States Bureau of Fisheries, are of the opinion that even a true swordfish is Kosher because it has scales when it is young but sheds them upon reaching a certain size. Similar problems relate to sturgeon.
[10] Plaintiffs have asserted a due process violation as a result of this alleged violation. The presumptive evidence that an establishment intends to sell non-Kosher food if non-Kosher food is found on the premises (N.J.A.C. 13:45A-21.6), is valid. While plaintiffs contend that the presumption is "arbitrary, unreasonable and conclusive," they are incorrect. The presumption has a rational connection between the proved fact and the presumed fact. But "the presumption may not be accorded mandatory effect." State v. Ingram, 98 N.J. 489, 498, 488 A.2d 545 (1985). All presumptions are rebuttable under Evid.R. 13 and 14. Although there is a defense that a defendant relied upon representations made by its supplier or manufacturer, N.J.A.C. 13:45A-21.7, there is nothing to indicate that this defense is exclusive. Certainly, any factual defense such as that raised by defendant (that the chickens were merely being held for return to the supplier) may be heard by the court.
[11] Plaintiffs further note a problem with the inspector's report of March 10, 1988. One of the charges involved 100 packages of raw meat allegedly not properly labeled, but they were not reported in the investigator's records of that date and only were added to the inspector's certification 13 months later. Plaintiffs assert that any lack of labeling at that time was due to the breakdown of the labeling machine, and noted that even if 100 packages were involved, there were over 2,000 packages in the case, all properly labeled.
[12] Plaintiffs' supervising rabbi allegedly inspects at least twice a week at unannounced different times. He found no deficiencies in plaintiffs' practices.
[13] We note, as does the dissent here, that Hygrade does not represent an establishment clause challenge. Rather, it was a due process, equal protection, and commerce clause case. While many of the issues such as overbreadth, vagueness and governmental interest are the same, we will consider the religious aspects separately.
[14] At oral argument we pressed the Attorney General to determine what was meant by this concession. We inquired whether if a Orthodox rabbi by study of religious authorities determined that modern slaughtering methods were less painful than the traditionally approved methods of slaughter, and advised the butcher that the meat of the animal so killed was in fact Kosher, the State would take no action. We even followed the point to the ultimate (and possibly absurd) question of whether a declaration by such a rabbi that pork was Kosher would be honored by the State. In both instances the response was that if the determinations were bona fide, and the dispute thus a religious one, the State would accept the variant interpretation. The Attorney General was quick to point out that the greater the variance from accepted standards, the less likely it would be that the State would accept that the belief was sincerely held, and the issue might have to be tried. But there would be no ipso facto rejection, and the real issue would be the bona fide nature of the belief.
[15] The most common of these, an "O" with a "U" at the center is the symbol of the joint Kashruth Commission of the Union of Orthodox Jewish Congregations of America. Others include various symbols used by the Kosher Supervision Service; Organized Kashruth Laboratories; Vaad Harabonim; Ko Kosher Service; Kosher Overseers Association of America; Council of Orthodox Rabbis; and Vaad Ha'ir of Montreal. Other symbols are used to show that the product is Kosher for Passover, and still other designations appear on wine.
[16] We do not, as urged by plaintiffs, read May v. Cooperman, 780 F.2d 240, 252-253 (3rd Cir.1985), appeal dismissed 484 U.S. 72, 108 S.Ct. 388, 98 L.Ed.2d 327 (1987), as rejecting the entire line of accommodation cases. May's reliance upon Estate of Thornton v. Caldor, Inc., 472 U.S. 703, 105 S.Ct. 2914, 86 L.Ed.2d 557 (1985), appears limited to the issue, not of accommodation of religion, but the lack of a secular purpose. While Thornton is a difficult case (an employee's absolute right to decline work on his or her Sabbath), we read the case as refusing to establish a preference for Sabbath observers, and thus not an attack on the accommodation approach of Zorach. The recent explicit return to the accommodation analysis in Board of Education, Westside Community Schools, supra, buttresses this analysis.
[17] The amicus brief and argument by the Attorney General of New York confirms that in the 75 years of regulation by the New York Authorities, no cases have come to light of any great variance in the interpretation of what was religiously Kosher, so that regulatory judicial hearings were needed to determine what was religiously acceptable. The cases which have arisen have been enforcement actions such as the one before us in which the issues were factual, and required no interpretation of Jewish law.
[18] Some of the amici who have argued in favor of the regulations contend that the reference to Jewish law is little different from reference to the law of a foreign country. The issue is not so simple. If a regulation permitted some action in New Jersey only if it was legal in France, and thus the state of French law was an issue of fact to be determined, the courts would be competent to perform this function. But the constitutional restrictions on religious entanglement prohibit the courts from making just such an adjudication of Jewish law. We need not resolve this aspect of the argument, however, given the State's explicit disclaimer noted earlier. The apposite side of this issue is exemplified by Cabinet v. Shapiro, 17 N.J. Super. 540, 86 A.2d 314 (Law Div. 1952), where the question of what was or was not "Kosher" was implicated in a libel action and the court states that an acknowledged Kosher standard could be recognized by a court.

We do have the right and the jurisdiction to determine a matter in violation of civil and property rights of a citizen even though such rights involve the fundamental concepts and dogma of the Hebrew religion and law. [at 547, 86 A.2d 314].
[19] Plaintiffs have implied that the real cause of their problems is a jurisdictional dispute between their supervising rabbi, who is centered in New York, and local Orthodox authorities who have urged plaintiffs to be supervised by an approved local rabbi. Again, we will not resolve or even inquire into this dispute.
[20] Out-of-state authorities have upheld various Kosher laws in the face of constitutional challenges. See People v. Atlas, 183 App.Div. 595, 170 N.Y.S. 834 (1st. Dept. 1918), aff'd without opinion 230 N.Y. 629, 130 N.E. 921 (1921) (prior to the sustaining of the New York regulation in Hygrade Provision Co. v. Sherman, supra); Erlich v. Municipal Court, Beverly Hills Judicial District, 55 Cal.2d 553, 11 Cal. Rptr. 758, 360 P.2d 334 (1961); Sossin Systems, Inc. v. Miami Beach, 262 So.2d 28 (Fla. Dist. Ct. App. 1972); and cf. National Foods, Inc. v. Rubin, 727 F. Supp. 104 (S.D.N.Y. 1989), expressly not determining whether prosecution in the face of an "honest religious disagreement" is constitutional, and dismissing the matter because the theological problems raised had no relation to the civil rights claims before the court.
[21] If there is a bona fide challenge to this assumption made by this court, i.e., if new Kosher standards are at some point promulgated by another branch of Judaism, the State of course could take no position as to the validity of one set of standards over the other. We accept the State's representation that it would not do so.
[1] The complete text of Madison's Memorial is appended to Justice Rutledge's dissenting opinion in Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1946), beginning at p. 63, 67 S.Ct. at p. 534.