608 A.2d 1353

RAN–DAV'S COUNTY KOSHER, INC., A NEW JERSEY CORPORA-
TION T/A COUNTY KOSHER; ARTHUR WEISMAN AND NA-
DINE WEISMAN, INDIVIDUALLY AND AS OFFICERS AND
SHAREHOLDERS OF RAN–DAV'S COUNTY KOSHER, INC.;
AND NEW JERSEY ALLIANCE OF KOSHER CATERERS,
PLAINTIFFS–APPELLANTS, v. STATE OF NEW JERSEY; PE-
TER N. PERRETTI, JR.; JAMES J. BARRY, JR.; RABBI YA-
KOV M. DOMBROFF; ATTORNEY GENERAL'S ADVISORY
COUNCIL ON KOSHER FOOD; MORRIS GLATT; DIANE LA
MONACO; AND DOES 1–50, DEFENDANTS–RESPONDENTS,
AND NATIONAL JEWISH COMMISSION ON LAW AND PUB-
LIC AFFAIRS, INTERVENOR–RESPONDENT.

Argued May 7, 1991—Decided July 22, 1992.

*Eric L. Chase* argued the cause for appellants (*Hannoch Weisman,* attorneys; *Eric L. Chase, Genevieve K. LaRobardier,* and *Barbara E. Turen,* on the briefs).

*Andrea M. Silkowitz,* Assistant Attorney General, argued the cause for respondents (*Douglas S. Eakeley,* Acting Attorney General of New Jersey, attorney; *John T. Ambrosio* and *Nancy Costello Miller,* Deputy Attorneys General, on the brief).

*Nathan Lewin,* a member of the District of Columbia bar, argued the cause for intervenor-respondent (*Greenberg & Epstein,* attorneys; *Edward J. Dauber* and *Ina B. Lewisohn,* on the briefs).

*Ronald K. Chen* argued the cause for *amicus curiae* American Civil Liberties Union of New Jersey.

*Bruce D. Shoulson* argued the cause for *amici curiae* The New Jersey Association of Reform Rabbis, The Reconstructionist Rabbinical Association, The New Jersey Region of the Rabbinical Assembly, The Rabbinical Council of New Jersey (*Lowenstein, Sandler, Kohl, Fisher & Boylan,* attorneys).

*Meyer L. Rosenthal* submitted a brief on behalf of *amicus curiae* The Anti–Defamation League of B'nai B'rith.

*Robert Abrams,* Attorney General of the State of New York, submitted a brief *amicus curiae, pro se.*

*Albert Burstein* submitted a brief on behalf of *amicus curiae* American Jewish Congress (*Herten, Burstein, Sheridan & Cevasco,* attorneys).

The opinion of the Court was delivered by

HANDLER, J.

In this appeal the Court is confronted with State consumer protection regulations that incorporate a complex body of religious doctrine and contemplate the assistance by clergy or religious experts in the interpretation and enforcement of that doctrine. Those regulations are challenged under the Religion Clauses of the federal and state constitutions that define and govern the relationship between religion and state.

Under regulations administered by the Division of Consumer Affairs, the State regulates the preparation, maintenance, and sale of kosher products. The regulations state that it is "an unlawful consumer practice" to sell or attempt to sell food "which is falsely represented to be Kosher." They define "Kosher" as "prepared and maintained in strict compliance with the laws and customs of the Orthodox Jewish religion." Those regulations were invoked by the Attorney General, who brought an enforcement action charging Ran–Dav's County Kosher, Inc. (County Kosher) and its principal, Arthur Weisman, with violations. The charged parties denied the allegations and claimed that the regulations violated the Religion Clauses of the federal and state constitutions. The constitutional claims were brought before the Appellate Division while the trial court retained jurisdiction of the enforcement action.

A majority of the Appellate Division upheld the constitutionality of the regulations. *Ran–Dav's County Kosher, Inc. v. State*, 243 *N.J.Super.* 232, 579 *A.*2d 316 (1990). A dissenting opinion took the position that the regulations were unconstitutional. *Id.* at 259, 579 *A.*2d 316. The issue is whether the kosher regulations facially violate the provisions of the federal and state constitutions that prohibit government establishment of religion. The constitutional issue is substantial, and the dissent brings the appeal to this Court as of right. *R.* 2:2–1.

We hold that the kosher regulations violate the Establishment Clauses of the federal and state constitutions. Our primary ground for that holding is that the regulations impose

substantive religious standards for the kosher-products industry and authorize civil enforcement of those religious standards with the assistance of clergy, directly and substantially entangling government in religious matters.

I

The difficult and unusual issue presented on this appeal calls first for an explanation of the subject matter of the challenged regulations and an analysis of the regulatory standards and enforcement procedures. That explanation will inform the inquiry into whether the regulatory scheme takes government too far into the religious domain.

Regulations governing the kosher-foods industry were promulgated in 1984 by the Division of Consumer Affairs under the authority of the Consumer Fraud Act, *N.J.S.A.* 56:8–4. The regulations make it "an unlawful consumer practice" to sell or attempt to sell food "which is falsely represented to be Kosher." *N.J.A.C.* 13:45A–21.2.

The word "kosher" (from the Hebrew "kasher") means "fit" or "ritually correct." It is used to refer to, among other things, the Jewish dietary laws. The practice of "kashrut" within Judaism serves to attain "kedusha" or holiness and is a fundamental tenet of the religion. The origin of the kosher laws can be traced back to the Torah (the first five books of the Bible), but most of the laws concerning what is kosher have developed through centuries of Talmudic debates (debates regarding the application of the principles contained in the Torah) and rulings by rabbinic scholars. The dietary laws of "kashrut" set forth rules covering "(1) permitted and forbidden animals, (2) forbidden parts of otherwise permitted animals, (3) the methods of slaughtering and preparing permitted animals, (4) forbidden food mixtures, and (5) proportions of food mixtures prohibited *ab initio* but permitted *ex post facto*." 243 *N.J.Super.* at 241, 579 *A.*2d 316 (quoting 8 *Encyclopedia of Religion* 270–71 (1987)). The laws of kashrut are complex and exacting. For

example, animals must be slaughtered in a prescribed manner by a trained person. Meat must be "koshered" according to specifically defined soaking and salting methods to draw out the blood. *Ibid.* Central to the doctrine of "kashrut" is the requirement of the "mashgiach," the religious authority who must supervise kosher butchers and certify compliance with the laws of kashrut. Without proper religious supervision, certain foods are simply non-kosher, even though constituted and prepared in identical fashion to kosher foods.

The court below suggested that there is universal agreement among the branches of Judaism that the standards governing the preparation and sale of food are those of Orthodox Judaism. *Ibid.* In fact, however, there is considerable disagreement over what precepts or tenets truly represent the laws of kashrut. There are differences of opinion concerning the application and interpretation of the laws of kashrut both within Orthodox Judaism and between Orthodox Judaism and other branches of Judaism. Herman Wouk, *This Is My God* (1959), *reprinted in The Life of Torah* 98–99 (Jacob Neusner ed., 1974). *See* Rabbi Hayim Halevy Donin, *To Be a Jew* 102–104, 112–119 (1972); Rabbi J. David Bleich, *Contemporary Halkhic Problems* 84–92 (1977). Some disputes arise in light of new technologies used in the preparation of foods. Bleich, *supra,* at 86–92. Other disputes arise because many members of the non-Orthodox branches of Judaism take divergent approaches to the adherence to the laws of kashrut, considering certain foods to be kosher even when not prepared in the strictest compliance with certain commonly accepted principles. Wouk, *supra,* at 99. *See* Donin, *supra,* at 103–04, 118–19.

Controversies over kosher products center not only on the nature of the products themselves but on the persons supervising their preparation. Wouk, *supra,* at 99; Donin, *supra,* at 112, 115, 118. Disputes constantly arise within Orthodox Judaism over the legitimacy of the various religious authorities purporting to ensure that food is kosher. *See, e.g., Kashrus Magazine,* September 1990, 26–32 (publishing a "Seven Page

Guide" of over 100 rabbinically-supervised kosher supervision services worldwide, but withholding endorsement of any particular service with the following disclaimer: *"Some of the [supervision services] are not relied upon by most of the kosher world. Consult your rabbi for which symbols you should use.").*

Because the laws of kashrut are so complex, compliance with them is highly labor intensive. Kosher food therefore costs more than non-kosher food. Because of those higher prices, and because most consumers cannot determine whether foods labeled as "kosher" were prepared under "kosher standards," unscrupulous vendors can reap substantial profits by misleading consumers into believing their products are kosher. 243 *N.J.Super.* at 251, 579 *A.*2d 316.

The false promotion of non-kosher foods harms a variety of consumers. Observant Jews may be induced, unwittingly, to break the laws of their religion. Kosher foods are important not only to Jews but to many other persons as well. Adherents to certain other faiths, especially those forbidding the consumption of pork, purchase kosher food to comply with their own religious requirements. People with particular health problems, such as shellfish allergies, buy kosher products to avoid troublesome food. Finally, some members of the general public believe that kosher meat is superior to non-kosher meat because it is prepared under especially close scrutiny. *Id.* at 247–48, 579 *A.*2d 316.

Those concerns are reflected in the social impact statement accompanying the initial adoption of the kosher regulations:

> The preparation of Kosher foods involves certain slaughtering and sanitary procedures and often results in a more expensive food product. These rules make it illegal to falsely represent food as Kosher or Kosher for Passover and thus protect the consumer who, for reasons of religion, conscience, quality or health, intends to purchase Kosher foods.

[16 *N.J.R.* 220(a).]

The regulations were substantially amended in 1987. *See* 19 *N.J.R.* 1060(a) (statement accompanying 1987 amendments).

The regulations address the preparation, maintenance and sale of kosher products. Throughout, the regulations refer explicitly to the "Orthodox Jewish religion" and the "laws and customs" of that religion to specify the standards that apply to the kosher food industry. "Kosher" is defined by the regulations to mean "prepared and maintained in strict compliance with the laws and customs of the Orthodox Jewish religion." *N.J.A.C.* 13:45a–21.1. The regulations also impose complicated guidelines governing the actual handling of foods. For example, the regulations expressly require that "Kosher meats must be maintained Kosher and must be properly deveined and, with the exception of liver, washed within 72 hours after slaughter, and within each subsequent 72 hours period in accordance with the laws and customs of the Orthodox Jewish religion." *N.J.A.C.* 13:45A–21.3(a)(2)(i). Establishments that deal in both kosher and non-kosher food must comply with detailed regulations regarding separation of the former from the latter. *Ibid.* Reflecting the necessity for religious supervision, establishments that sell only kosher food must advise the Director of Consumer Affairs of their rabbinical supervision. *N.J.A.C.* 13:45A–21.5.

Violations of the regulations are subject to the penalties of the Consumer Fraud Act, namely, injunctions, *N.J.S.A.* 56:8–8, and fines, *N.J.S.A.* 56:8–13 (imposing fines up to $2,000 for first offense, up to $5,000 for subsequent offenses). Civil enforcement of the regulations is undertaken by the Bureau of Kosher Enforcement within the Division of Consumer Affairs, in the State Department of Law and Public Safety, which is under the jurisdiction of the Attorney General. The State Kosher Advisory Committee shares responsibility for the enforcement of the regulations. The Attorney General created that Committee, pursuant to the Consumer Fraud Act and the kosher regulations, by Executive Directive No. 1987–2. The Committee consists of ten rabbis appointed by the Attorney General, nine of whom are orthodox rabbis, the tenth being a conservative rabbi. The Chairman of the Committee is the Chief of the Bureau of

Kosher Enforcement. The Committee's function is to "advise the Attorney General on Kosher matters and enforcement of the New Jersey Kosher regulations ... and make recommendations for regulatory changes." 243 *N.J.Super.* at 240, 579 *A.*2d 316.

The record indicates that on five occasions during 1987–89, investigators employed by the Bureau of Kosher Enforcement inspected County Kosher and noted possible violations. First, an inspector noticed calves' tongues soaking in a full-strength brine solution. Pursuant to *N.J.A.C.* 13:45A–21.3(a)(2)(i), Kosher meat must be deveined, but those tongues had not been deveined. Next, an inspector found six boxes of Shelat brand chicken breasts in a storage freezer, a brand of chicken that recently had been determined to be non-kosher. The storage of kosher food with non-kosher food is prohibited by *N.J.A.C.* 13:45A–21.3(a)(1)(ii). Third, inspectors observed blood and a vein in meat that was to be ground for hamburger, contrary to *N.J.A.C.* 13:45A–21.3(a)(2)(i). Finally, an inspector noted a problem involving the labeling of meat. County Kosher's operations are supervised by an orthodox rabbi who contended that the establishment's activities complied with the kosher laws. Nevertheless, the foregoing incidents formed the basis of the consumer fraud charges against appellants.[1]

## II

The First Amendment to the United States Constitution provides that "Congress shall make no law respecting an estab-

---

[1]The National Jewish Commission on Law and Public Affairs intervened as a party. Others subsequently joined the litigation as *amicus curiae,* namely, the American Civil Liberties Union (ACLU), the Anti–Defamation League of B'nai Brith (ADL), the American Jewish Congress (AJC), the National Jewish Commission on Law and Public Affairs (COLPA), Robert Abrams, the Attorney General of New York, and four rabbinical associations, including the New Jersey Association of Reform Rabbis, the Reconstructionist Rabbinical Association, the New Jersey Region of the Rabbinical Assembly and the Rabbinical Council of New Jersey.

lishment of religion, or prohibiting the free exercise thereof." The United States Supreme Court has explained: "The First Amendment's Religion Clauses mean that religious beliefs and religious expression are too precious to be either proscribed or prescribed by the State." *Lee v. Weisman*, — *U.S.* ——, ——, 112 *S.Ct.* 2649, 2656, 120 *L.Ed.*2d 467, 482 (1992). The Religion Clauses of the First Amendment have been applied to the states since *Cantwell v. Connecticut*, 310 *U.S.* 296, 60 *S.Ct.* 900, 84 *L.Ed.* 1213 (1940) (Free Exercise Clause) and *Everson v. Board of Education*, 330 *U.S.* 1, 67 *S.Ct.* 504, 91 *L.Ed.* 711 (1947) (Establishment Clause).

The New Jersey Constitution also contains a Religion Clause. "There shall be no establishment of one religious sect in preference to another." *N.J. Const. art.* I, *para.* 4. In *Tudor v. Board of Education of Rutherford*, 14 *N.J.* 31, 45, 100 *A.*2d 857 (1953), *cert. denied*, 348 *U.S.* 816, 75 *S.Ct.* 25, 99 *L.Ed.* 644 (1954), Chief Justice Vanderbilt stated that under both the federal and state constitutions, "the state or any instrumentality thereof cannot under any circumstances show a preference for one religion over another." This Court has observed that New Jersey's Religion Clause, which contains no reference to the "free exercise" of religion, "is less pervasive, literally, than the Federal provision," *Clayton v. Kervick*, 56 *N.J.* 523, 528, 267 *A.*2d 503 (1970), *vacated on other grounds*, 403 *U.S.* 945, 91 *S.Ct.* 2274, 29 *L.Ed.*2d 854 (1971), and therefore the Court has not been impelled to interpret the state constitution more broadly than the federal constitution in cases implicating the establishment of religion. *Right to Choose v. Byrne*, 91 *N.J.* 287, 313, 450 *A.*2d 925 (1982); *Marsa v. Wernik*, 86 *N.J.* 232, 239–40 n. 2, 430 *A.*2d 888, *cert. denied*, 454 *U.S.* 958, 102 *S.Ct.* 495, 70 *L.Ed.*2d 373 (1981); *Resnick v. East Brunswick Township Bd. of Education*, 77 *N.J.* 88, 104, 389 *A.*2d 944 (1978); *Clayton v. Kervick, supra*, 56 *N.J.* at 528, 267 *A.*2d 503. In any event, interpretation of the state constitutional standard is informed by an understanding of federal constitutional doctrine concerning the establishment of religion.

The constitutional strictures on government action concerning religion seek to avoid certain evils. They include discrimination among religions or between religion and nonreligion, symbolic union between government and a given religious faith or religion in general, sponsorship of the religious mission of a group, excessive entanglement between government and religion, and political divisiveness incited by the government's favoritism of a particular religious faith. *See Grand Rapids School Dist. v. Ball,* 473 *U.S.* 373, 390, 392–97, 105 *S.Ct.* 3216, 3226, 3227–29, 87 *L.Ed.*2d 267, 281–86 (1985); *Committee for Pub. Educ. & Religious Liberty v. Nyquist,* 413 *U.S.* 756, 794–98, 93 *S.Ct.* 2955, 2976–78, 37 *L.Ed.*2d 948, 975–77 (1973); *Lemon v. Kurtzman,* 403 *U.S.* 602, 611–15, 91 *S.Ct.* 2105, 2111–12, 29 *L.Ed.*2d 745, 756–57 (1971); *Walz v. Tax Comm'n,* 397 *U.S.* 664, 674, 90 *S.Ct.* 1409, 1414, 25 *L.Ed.*2d 697, 704 (1970); *Torcaso v. Watkins,* 367 *U.S.* 488, 495, 81 *S.Ct.* 1680, 1683–84, 6 *L.Ed.*2d 982, 987 (1961).

■ The basic standard for determining the proper application of the Establishment Clause is the three-pronged test of *Lemon v. Kurtzman, supra,* 403 *U.S.* at 612–13, 91 *S.Ct.* at 2111, 29 *L.Ed.*2d at 756–57. However, in cases of state action that patently create denominational preferences, a different analysis controls. A law that creates "explicit and deliberate distinctions between different religious organizations" must be regarded "as suspect and [subject to] strict scrutiny in adjudging its constitutionality." *Larson v. Valente,* 456 *U.S.* 228, 246, 102 *S.Ct.* 1673, 1684, 72 *L.Ed.*2d 33, 48–49 (1982); *see Hernandez v. Commissioner,* 490 *U.S.* 680, 109 *S.Ct.* 2136, 104 *L.Ed.*2d 766 (1989).

The Appellate Division concluded that the regulations did not constitute a *per se* violation of the Establishment Clause under *Larson.* It determined that the regulations, by expressly adopting the laws of the "Orthodox Jewish religion," did not prefer Judaism over other religions, and that the enforcement of kosher standards does not disfavor or denigrate any other

religion. 243 *N.J.Super.* at 250, 579 *A*.2d 316. It also accepted the State's argument that the regulations do not prefer Orthodox Judaism over other branches because merchants are free to observe dietary laws according to any standard they choose. *Id.* at 246–47, 579 *A*.2d 316.

The ruling of the Appellate Division that the regulations do not create a preference within the Jewish religion was based mainly on the assumption that the State's enforcement policy under the regulations allows merchants to apply their own sincerely held variant interpretations of kashrut. *Id.* at 246–47 & n. 14, 249, 255, 257–59, 579 *A*.2d 316. However, the State apparently has abandoned its position that the regulations allow different interpretations of the kosher laws. Rather, it now contends that a uniform standard must be applied. See discussion *infra* at 159–60. The clear implication of that change of position is that merchants sincerely believing that their products are kosher could nevertheless be prosecuted under the regulations if the State believes that their products do not conform to the standards of Orthodox Judaism as the State defines and applies them.

Despite our doubts surrounding the Appellate Division's ruling that the regulations are valid under the *Larson* test, we decline to invoke that standard, primarily because the record suggests uncertainty concerning both the precise meaning and the enforcement standards of the regulations. In any event, we are satisfied that because the kosher regulations directly, clearly, and inescapably violate the standards of *Lemon*, we need not resolve the issue of whether the regulations constitute a *per se* violation of the First Amendment under the *Larson* test.

Three elements must be met under *Lemon, viz*:

First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion, ... finally, the statute must not foster "an excessive government entanglement with religion."

[403 *U.S.* at 612–13, 91 *S.Ct.* at 2111, 29 *L.Ed.*2d at 755 (quoting *Walz, supra,* 397 *U.S.* at 674, 90 *S.Ct.* at 1414, 25 *L.Ed.*2d at 704).]

Because the kosher regulations provide both substantive standards prescribing religious practices and procedures for their enforcement, the entanglement prong, which prohibits excessive government involvement in religious matters, is most germane in assessing the constitutional validity of the administrative scheme.

The prohibition against undue government involvement in religion "rests upon the premise that both religion and government can best work to achieve their lofty aims if each is left free from the other within its respective sphere." *People of Illinois ex rel. McCollum v. Board of Educ.*, 333 *U.S.* 203, 212, 68 *S.Ct.* 461, 465, 92 *L.Ed.* 649, 659 (1948). This prong most closely connects the *Lemon* test to Jefferson's notion of a "wall of separation" between church and state. *See Reynolds v. United States*, 98 *U.S.* 145, 164, 25 *L.Ed.* 244, 249 (1879) (quoting reply from Thomas Jefferson to the Danbury Baptist Association, Jan. 1, 1802). The Supreme Court has stated, "Some limited and incidental entanglement between church and state authority is inevitable in a complex modern society, . . . but the concept of a 'wall' of separation is a useful signpost." *Larkin v. Grendel's Den, Inc.*, 459 *U.S.* 116, 123, 103 *S.Ct.* 505, 510, 74 *L.Ed.*2d 297, 305 (1982).

In considering whether the kosher regulations foster excessive government entanglement with religion, we initially note that they impose substantive religious standards on establishments purporting to be kosher. Specifically, the regulations contain numerous requirements relating to religious practices essential in the preparation and maintenance of kosher foods. Further, those requirements must be met "in strict compliance with the laws and customs of the Orthodox Jewish religion." Hence, the administrative scheme does more than require that businesses purporting to be under a certain type of rabbinical supervision are in fact under that type of supervision; it requires such establishments to adhere strictly to religious

kosher standards in the conduct of their business and authorizes the State to monitor the adherence to those standards. As a result, Jewish law prescribing religious ritual and practice is inextricably intertwined with the secular law of the State. Further, the State itself takes on the traditional religious supervisory role, thereby partially supplanting the Jewish organizations and institutions that historically have stood as final judges of religious matters.

The State contends that the regulations control only the false promotion and sale of non-kosher products. It acknowledges that the regulations incorporate a substantive religious standard, but argues that doing so is necessary in order to protect consumers of kosher products from misrepresentation. However, the State's adoption and enforcement of the substantive standards of the laws of kashrut is precisely what makes the regulations religious, and is fatal to its scheme. The regulations govern the promotion and sale of kosher products by regulating their antecedent preparation and maintenance. They empower the State to establish fraud or misrepresentation in the promotion of the product by demonstrating that the product was not prepared and maintained in "strict compliance" with what the State itself believes to be "the laws and customs of the Orthodox Jewish religion." In that respect, as pointed out by the appellant, "[t]he regulations do not police the nutritional quality or sanitary purity of kosher food, but only its religious purity." In doing so, they create an unconstitutional entanglement of government and religion analogous to that recognized in *Spacco v. Bridgewater School Dep't*, 722 *F.Supp.* 834, 844–47 (D.Mass.1989), where a municipality leased a Catholic parish center for use as public elementary school, provided that the town's use of the center would "at all times be consistent with the teachings of the Roman Catholic Church enunciated by the Holy Father and the Bishops in communion with him."

The regulations thus squarely put the State's imprimatur behind certain foods that can be lawfully sold as kosher, and plainly punish merchants who, without State approval, insist that other foods are kosher as well. As we explain below, *infra* at 160–61, we cannot construe the regulations, as the dissent would, as providing a "good faith" defense to enforcement actions by the State. *Cf. post* at 171–72. We stress, however, that our analysis is based on the Establishment Clause, not the Free Exercise Clause. Under the Establishment Clause, the State can neither impose religious rules nor endorse religious norms.

The State observes that many people purchase kosher products for non-religious reasons and, from that fact, it posits that the concept of "kosher" has assumed a secular as well as a religious meaning. The State confuses the meaning of the law with the motives of consumers. "Kosher" means "ritually correct." To be sure, the ritual correctness of products preparation may be irrelevant to those consumers who purchase kosher food only in order to avoid pork or shellfish, or because kosher food is said to be prepared in more sanitary fashion than non-kosher foods. Nevertheless, the kosher regulations mandate that food sold as kosher be prepared in ritually correct fashion. The religious indifference of some consumers does not empty those regulations of their fundamentally religious character.

The sectarian nature of the regulations is further evidenced by the religious qualifications of the persons selected to enforce the regulations. The Chief of the Bureau of Enforcement is an orthodox rabbi. The Advisory Committee, which is authorized to advise the enforcement agency about compliance with the kosher regulations, consists entirely of rabbis. The Appellate Division and the dissent both suggest, however, that the religious identity of those persons is not important. 243 *N.J.Super.* at 254, 579 *A.2d* 316; *post* at 180.

The employment qualifications of state officials and employees often reflect the nature of their duties. For example, all of the professional boards under the jurisdiction of the Attorney General are composed of persons with special professional qualifications related to their regulatory authority. See generally Title 45, Professions and Occupations, *N.J.S.A.* 45:1–1 to 25 (prescribing qualifications for boards such as certified public accounts, architects, barbers, dentists, chiropractors, engineers, marriage counselors, nurses, etc.). The expertise of administrative agencies is an important aspect of the authority they exercise and the deference given to their determinations. *In re Amendment of N.J.A.C. 8:31B–3:31*, 119 *N.J.* 531, 543, 575 *A.*2d 481 (1990) (according "substantial deference" to regulations of administrative agencies based on a recognition of their "peculiar competence"). In this case, the existence of an Advisory Committee composed predominantly of orthodox rabbis underscores the theological or religious nature of the State's regulatory endeavors. *See Lee, supra*, —— *U.S.* at ——, 112 *S.Ct.* at 2655–56, 120 *L.Ed.*2d at 480–82 (noting that a public school's selection of a rabbi to deliver a benediction at a graduation ceremony underscored the religious nature of the benediction).

We readily acknowledge that the religious persuasion of State employees usually imparts no religious cast to the functions they perform. In this case, however, it is plain that the Committee was constituted as it was precisely because rabbis have the expertise, education, training, and religious authority to interpret, apply, and enforce the regulations. We do not construe the State's regulatory scheme as imposing a religious qualification on its enforcement personnel, and we certainly do not suggest that it ever would be appropriate to *exclude* adherents to particular religions from any state body, but we cannot disregard or discount the manner in which the enforcement entities have been constituted. In this case, as in many others, the manner in which a law has been administered is a strong indicator of the government's understanding of its rules, which can aid our own understanding of their meaning. *See,*

*e.g., Cedar Cove, Inc. v. Stanzione,* 122 *N.J.* 202, 212, 584 *A.*2d
784 (1991); *Peper v. Princeton Univ. Bd. of Trustees,* 77 *N.J.*
55, 69–71, 389 *A.*2d 465 (1976).  Contrary to the assertion in the
dissent that we determine the validity of those rules as applied,
*see Post* at 180, we simply observe that the appointment by the
State of enforcement officials with religious qualifications con-
firms that the regulations themselves have a principally reli-
gious meaning.

In some ways, this case presents an interrelationship between
government and religion reminiscent of those found in *Larkin,*
*supra,* and *State v. Celmer,* 80 *N.J.* 405, 404 *A.*2d 1 (1979)
(partially overruling *Schaad v. Ocean Grove Camp Meeting*
*Ass'n,* 72 *N.J.* 237, 370 *A.*2d 449 (1977)).  In *Larkin,* the
challenged statute vested in churches and schools the power to
veto applications for liquor licenses within five hundred feet of
the church or school.  The Supreme Court concluded that the
statute enmeshed the churches in the exercise of government
powers, violating the entanglement prong of the *Lemon* Estab-
lishment Clause test.  459 *U.S.* at 127, 103 *S.Ct.* at 512, 74
*L.Ed.*2d at 297.  In *Celmer,* the challenged ordinance ceded all
municipal law enforcement authority to the United Methodist
Church.  There we voided a conviction for traffic violations
obtained pursuant to the ordinance because it entrusted a
religious entity with civil authority.  80 *N.J.* at 420, 404 *A.*2d 1.
In contrast to those two cases, which involved the enforcement
by religious bodies of secular or civil law, here we have enforce-
ment by religious personnel of a sectarian or religious law.
Thus, in this case the entanglement between religion and state
is even more apparent.

██  The entanglement test under the Establishment Clauses
of our constitutions forbids government adoption and enforce-
ment of religious law.  That test also forbids government
resolution of religious disputes.  The government may not
"lend its power to one or the other side in controversies over
religious authority or dogma."  *Employment Div., Dep't of*

*Human Resources v. Smith,* 494 *U.S.* 872, 877, 110 *S.Ct.* 1595, 1599, 108 *L.Ed.*2d 876, 884 (1990) (citing *Presbyterian Church v. Mary Elizabeth Blue Hull Memorial Presbyterian Church,* 393 *U.S.* 440, 445–52, 89 *S.Ct.* 601, 604–08, 21 *L.Ed.*2d 658, 663–67 (1969)); *Serbian Eastern Orthodox Diocese v. Milivojevich,* 426 *U.S.* 696, 708–25, 96 *S.Ct.* 2372, 2380–88, 49 *L.Ed.*2d 151, 162–71 (1976); *Kedroff v. St. Nicholas Cathedral,* 344 *U.S.* 94, 95–119, 73 *S.Ct.* 143, 143–56, 97 *L.Ed.* 120, 126–38 (1952).

The Appellate Division majority concluded that the State would not be involved in doctrinal disputes under the regulations. It apparently believed that disputes would be infrequent and inconsequential because, as stated by the Attorney General, "all branches of Judaism recognize and agree that there is 'a single historical standard of kosher determination.'" The dissent expresses a similar view, suggesting that the regulations will not give rise to many disputes because they impose a "uniform, objective, and therefore secular standard." *Post* at 172.

Our examination of the record and secondary sources reveals that differences of opinion do exist with respect to the laws of kashrut and that disputes do arise. See *supra* at 146–48. Because of varying doctrinal interpretations, varying degrees of trust that members of some sects place in the food supervisors of other sects, and varying "shades of observance" undertaken by individual Jews, no one practice can be called "the only true Judaism." Wouk, *supra,* at 99. Disputes may occur infrequently, but when they do, they are ineluctably religious in tenor and content. The dissent criticizes those conclusions as based on information taken from secondary sources. *Post* at 182–83. That criticism must be tempered. We would note that the dissent itself relies on information hardly distinguishable from secondary materials, namely, the beliefs of four rabbis who happen to be associated with the State, to support its assertion that there is unanimity concerning the Jewish dietary laws. Indeed, the authority on which the dissent relies suggests a lack of unanimity. One of the rabbis cited by the

dissent concedes that the laws of kashrut evolve as they are "interpreted and construed by authoritative rabbis in each generation." He and another rabbi acknowledge that individual Jews take different approaches with respect to the observance of the laws of kashrut. In addition, many of the cases cited in the dissent for the proposition that the laws of kashrut are "uniform" actually concede that disagreements exist. *See, e.g. Hygrade Provision Co. v. Sherman*, 266 *U.S.* 497, 45 *S.Ct.* 141, 69 *L.Ed.* 402 (1925); *Barghout v. Mayor & City Council*, 325 *Md.* 311, 600 *A.*2d 841 (1992); *National Foods, Inc. v. Rubin*, 727 *F.Supp.* 104 (S.D.N.Y.1989). In any event, we must point out that reliance on secondary materials is entirely proper in cases like this one. As the Supreme Court noted in *County of Allegheny v. Greater Pittsburgh ACLU*, 492 *U.S.* 573, 614–15 n. 60, 109 *S.Ct.* 3086, 3112 n. 60, 106 *L.Ed.*2d 472, 507–08 n. 60 (1989), courts should not hesitate to refer "to secondary sources in aid of their Establishment Clause analysis." To ignore secondary sources, said the Court, is to write a judicial "prescription for ignorance." *Ibid.*

The Attorney General concedes that it is neither realistic nor accurate to view the laws of kashrut as being immune from dispute. At one point in the litigation, he took the position that government involvement in disputes over meaning could be avoided by the simple expedient of not deciding them. "[W]here Orthodox Jewish authorities dispute the force or requirement of a particular definition of kosher, the State is precluded from choosing one interpretation over the other"; the bureau would not enforce the regulations against a purveyor who had adopted a variant interpretation of kashrut based on sincerely held beliefs. 243 *N.J.Super.* at 246 & n. 14, 579 *A.*2d 316. However, the State's current position is that "because of consumer expectations, a merchant's or his supervising rabbi's variant, albeit good faith, religious belief that under Orthodox Jewish law pork is kosher, may be regulated by the State."

The Attorney General's current understanding of kosher regulations comports with the actual text of the regulations,

which refers to the kosher laws as those being in "strict compliance" with Orthodox Jewish doctrine. *N.J.A.C.* 13:45A–21.2. The enforcement position of strict compliance also appears to be consistent with prevailing state policy. See generally *N.J.A.C.* 13:45A–21 and –22 (as amended, 1987) (current kosher regulations calling for strict compliance and expanding prior regulations by requiring more exacting procedures for preparation and maintenance of kosher foods, for identification of products, and for inspections). *See also N.J.S.A.* 2C:21–7.4 (amended, *L.*1988, *c.* 154) (imposing disorderly persons sanctions for misrepresentation of non-kosher products as kosher, which is defined as strict compliance with Orthodox Judaism).

The Attorney General has acknowledged that the Bureau of Enforcement would be obligated under the kosher regulations to obtain injunctions against merchants adhering to their own understandings of Jewish law in general or Jewish Orthodoxy in particular. The conclusion is inescapable that if a merchant did not adhere to Jewish Orthodoxy, as perceived by the Bureau of Enforcement, and the State legally challenged the merchant's right to sell his or her products as "kosher," a court would have to resolve whether the merchant's view of kashrut diverged from the State's definition of Jewish Orthodoxy. It is difficult to envision a civil controversy stamped more indelibly with religious doctrine.

The laws of kashrut are intrinsically religious, whether they are ambiguous or not and whether they are disputed or not. Religious doctrines cannot be recast as secular principles simply because they are clear. *See, e.g., Spacco, supra,* 722 *F.Supp.* at 844–47 (recognizing inherent religious character of "the teachings of the Roman Catholic Church enunciated by the Holy Father and the Bishops in communion with him"). Nor do religious doctrines become neutral simply because they are widely or even universally held. *Lee, supra,* —— *U.S.* at ——, 112 *S.Ct.* at 2655–56, 120 *L.Ed.*2d at 480–82. Neutral principles are "wholly secular legal rules whose application to religious parties or disputes does not entail theological or doctrinal

evaluations." *Elmora Hebrew Center v. Fishman,* 125 *N.J.* 404, 414–15, 593 *A.*2d 725 (1989).

We recognized in *Elmora Hebrew Center* that civil courts may resolve controversies involving religious groups if resolution can be achieved by reference to neutral principles of law, but that they may not resolve such controversies if resolution requires the interpretation of religious doctrine. *See, e.g., Jones v. Wolf,* 443 *U.S.* 595, 602, 99 *S.Ct.* 3020, 3024, 61 *L.Ed.*2d 775, 783 (1979); *Presbyterian Church, supra,* 393 *U.S.* at 449, 89 *S.Ct.* at 606, 21 *L.Ed.*2d at 665; *Minkin v. Minkin,* 180 *N.J.Super.* 260, 266, 434 *A.*2d 665 (Ch.Div.1981); *Avitzur v. Avitzur,* 459 *N.Y.S.*2d 572, 574, 58 *N.Y.*2d 108, 114–15, 446 *N.E.*2d 136, 138, *cert. denied,* 464 *U.S.* 817, 104 *S.Ct.* 76, 78 *L.Ed.*2d 88 (1983). Neutral principles may be particularly suited for adjudications of property disputes, *Presbyterian Church, supra,* 393 *U.S.* at 449, 89 *S.Ct.* at 606, 21 *L.Ed.*2d at 665; *see Eldership v. Church of God at Sharpsburg,* 396 *U.S.* 367, 90 *S.Ct.* 499, 24 *L.Ed.*2d 582 (1970) (Brennan, J., concurring), or civil contract actions, *Welter v. Seton Hall Univ.,* 128 *N.J.* 279, 608 *A.*2d 206 (1992); *Elmora Hebrew Center, supra,* 125 *N.J.* at 420, 593 *A.*2d 725; *Jewish Center of Sussex County v. Whale,* 86 *N.J.* 619, 432 *A.*2d 521 (1981); *see Christian Science Bd. of Directors v. Evans,* 105 *N.J.* 297, 306, 520 *A.*2d 1347 (1987), but not where disputes involve interpretations of religious doctrine itself. *Elmora Hebrew Center, supra,* 125 *N.J.* at 420, 593 *A.*2d 725 (holding that only religious authorities can determine scope of duties of "orthodox rabbi"); *Chavis v. Rowe,* 93 *N.J.* 103, 112, 459 *A.*2d 674 (1983); *see Alicea v. New Brunswick Theological Seminary,* 244 *N.J.Super.* 119, 581 *A.*2d 900 (1990), *aff'd on other grounds,* 128 *N.J.* 303, 608 *A.*2d 218 (1992). Here, the disputes that would arise under the kosher laws would call inescapably on the State to assume a religious role. The State itself invariably would be one of the disputants, seeking to impose and enforce its own interpretation of Orthodox Jewish doctrine, and any adjudication by a

court of such disputes inevitably would entail the application and interpretation of Jewish law.

The factors that entangle government in religion through the kosher regulations also implicate the effects prong of the *Lemon* test, which dictates that the principal or primary effect of government action neither advance nor inhibit religion. The Appellate Division, untroubled by that prong, stated simply that "[t]he parties and *amici* have not urged a violation of this prong of the test." 243 *N.J.Super.* at 252, 579 *A.*2d 316. The Appellate Division erred in concluding that a violation of the effects prong was not an issue in this case. County Kosher contended that the kosher regulations violate the effects prong because their religious impact cannot be separated from their secular impact. The State countered by asserting that "the primary effect of the Regulations is the advancement of consumerism." In our view, County Kosher was correct.

According to the State, the regulations work as one element of the Consumer Fraud Act and affect only the commercial activities of selling and advertising merchandise. The State asserts that the regulations do not influence religious concerns; rather, kosher food has overcome its purely religious significance and has taken on a secular significance to the general public. *See County of Allegheny, supra,* 492 *U.S.* 573, 109 *S.Ct.* 3086, 106 *L.Ed.*2d 472 (upholding menorah display adjacent to Christmas tree in park on basis of secular connotations associated with both holidays). The Appellate Division agreed, apparently finding relevant that New York's experience with its kosher statute "has shown no unwarranted effect." 243 *N.J.Super.* at 259, 579 *A.*2d 316.

We remain unpersuaded by the repeated contention that the laws of kashrut have become secular norms. We are not here confronted with legislation that is religious only in its historical origins but non-religious in its current applications. *E.g., McGowan v. Maryland,* 366 *U.S.* 420, 81 *S.Ct.* 1101, 6 *L.Ed.*2d 393 (1961) (stating that Sunday closing laws, although religious

in origin, are applied without reference to religious purpose or principles); *Vornado, Inc. v. Hyland,* 77 *N.J.* 347, 390 *A.*2d 606 (1978), *appeal dismissed,* 439 *U.S.* 1123, 99 *S.Ct.* 1037, 59 *L.Ed.*2d 84 (1979) (same). The kosher regulations rely expressly on religious tenets concerning what is kosher and who should be trusted to supervise kosher food preparation. Because they work both as a constraint and as an inducement on merchants who must abide by them and on consumers who cannot avoid them, the primary, if not exclusive, effect of the regulatory process necessarily is to advance particular religious tenets.

■ State action that engenders identification of the government with a religion, or religions in general, constitutes the unconstitutional establishment of religion, for it always will advance at least one religion and, depending on the nature of the governmental activity, it often will inhibit other religions as well. In *Grand Rapids School Dist., supra,* 473 *U.S.* at 389, 105 *S.Ct.* at 3225, 87 *L.Ed.*2d at 281, the Supreme Court stated that the effects prong is violated "when the government fosters a close identification of its powers and responsibilities with those of any—or all—religious denominations." Such a close identification plainly is fostered by the enforcement of the kosher regulations, for the State adopts religious law as its own. In addition, as earlier noted, the Chief of the Bureau of Kosher Enforcement and the entire Advisory Committee are rabbis, individuals qualified under Judaic law to interpret the laws of kashrut. Because those individuals are being used by and for the State in their religious capacity to interpret and enforce state law, the religious and civil authority possessed by them is virtually indistinguishable.

■ Even a symbolic union between government and religion would contravene the effects prong of the Establishment Clause. *Grand Rapids School Dist., supra,* 473 *U.S.* at 389, 105 *S.Ct.* at 3225, 87 *L.Ed.*2d at 284. Government practices may not "have the effect of communicating a message of government endorsement or disapproval of religion." *Lynch v.*

*Donnelly, supra,* 465 *U.S.* at 692, 104 *S.Ct.* at 1367, 79 *L.Ed.*2d at 622 (O'Connor, J., concurring). In *Larkin v. Grendel's Den, supra,* the Supreme Court observed that "the mere appearance of a joint exercise of legislative authority by Church and State provides a significant symbolic benefit to religion in the minds of some by reason of the power conferred." *Id.* at 125–26, 103 *S.Ct.* at 511, 74 *L.Ed.*2d at 306. The Court concluded that state action promoting such an image violates the Establishment Clause, for it has "a 'primary' and 'principal' effect of advancing religion." *Ibid.* Here, the symbolism is especially graphic and the benefit to religion more than symbolic: the State is calling on religious personnel to enforce and certify religious compliance.

■ The dissent intimates that the regulations may have been designed to "accommodate consumers who purchase kosher food for religious reasons," but that they do not actually advance a particular religious view. *Post* at 178. However, "an accommodation of religion, in order to be permitted under the Establishment Clause, must lift 'an identifiable burden *on the exercise of religion.'* " *County of Allegheny, supra,* 492 *U.S.* at 613 n. 59, 109 *S.Ct.* at 3111 n. 59, 106 *L.Ed.*2d at 507 n. 59 (quoting *Corporation of Presiding Bishop of Church of Jesus Christ of Latter–Day Saints v. Amos,* 483 *U.S.* 327, 348, 107 *S.Ct.* 2862, 2875, 97 *L.Ed.*2d 273, 291 (1987) (O'Connor, J., concurring). In general, accommodation takes the form of exempting religious groups from laws of general applicability. *County of Allegheny, supra,* 492 *U.S.* at 613 n. 59, 109 *S.Ct.* at 3111 n. 59, 106 *L.Ed.*2d at 507 n. 59; *see Jones v. Butz,* 374 *F.Supp.* 1284, 1292–93 (S.D.N.Y.1974), *aff'd,* 419 *U.S.* 806, 95 *S.Ct.* 22, 42 *L.Ed.*2d 36 (1974) (holding that the Humane Slaughter Act, 7 *U.S.C.* §§ 1901 et seq. (1970), permissibly accommodates the free exercise of religion by exempting persons of Jewish faith from generally applicable statutory guidelines that proscribe practices mandated by the laws of kashrut).

■ The regulations at issue in this case do not constitute permissible accommodation of Orthodox Judaism. The Attorney General has not pointed to any state-imposed burdens under which Orthodox Jews currently suffer. If the regulations did not exist, observance of the laws of kashrut would go on, free of state intervention, as it has for thousands of years. The regulations merely serve to advance the form of Orthodox Judaism that the State enforces. "The principle that government may accommodate the free exercise of religion does not supersede the fundamental limitations imposed by the Establishment Clause." *Lee, supra,* —— *U.S.* at ——, 112 *S.Ct.* at 2655, 120 *L.Ed.*2d at 480.

■ Finally, to survive an Establishment Clause challenge under the purpose prong of *Lemon,* the regulations also must have a valid secular purpose. State action is invalid under that prong only when there is "no question that the statute or activity was motivated wholly by religious considerations." *Lynch v. Donnelly, supra,* 465 *U.S.* at 680, 104 *S.Ct.* at 1362, 79 *L.Ed.*2d at 614.

The State argues that the "secular legislative purpose" of the regulations is to protect consumers against misrepresentation in the sale of food. The focus of the regulations is on the purchase and sale of kosher food, which "is nothing more than a commercial transaction between the merchant and the consumer" carrying no religious significance. The majority of the Appellate Division concurred in the State's position, concluding that the regulations had a valid secular purpose, *viz,* "the protection against intentional and negligent misrepresentation in the sale of Kosher food." 243 *N.J.Super.* at 251, 579 *A.*2d 316.

The conceptual difficulty with that conclusion is that although the objective of the regulation is to protect against fraudulent sales, the focus of the enforcement provisions is not so limited. That focus is directed to the preparation and maintenance of products in strict compliance with Orthodox

Jewish doctrine. The regulations authorize a consumer fraud action founded on the fact that the product itself was prepared or maintained in ritually incorrect fashion, in violation of the laws of kashrut. In that respect, the regulations are, as characterized by appellants, "quintessentially and unavoidably religious in character." The regulations may have been designed to assure truth in marketing, but the truths being marketed are, in essence, religious truths. Troubled though we are by the Appellate Division's holding, we see no need to delve further into the purpose issue in light of our conclusion that the regulations involve the State excessively in religious matters and generate significant effects serving to advance religious interests.

We thus conclude that the kosher regulations as presently formulated violate the Establishment Clauses of the federal and state constitutions.

### III

Our decision invalidating the current regulations does not mandate "that the government show a callous indifference to religious groups," *Zorach v. Clauson,* 343 *U.S.* 306, 314, 72 *S.Ct.* 679, 684, 96 *L.Ed.* 954, 962 (1952), nor does it leave consumers of kosher products bereft of protections against fraudulent and unscrupulous practices. The State unquestionably has a valid interest in preventing fraud in the sale of any foods, including kosher foods. There are effective ways to achieve that end that will not offend constitutional strictures against state involvement in religion. The State can regulate the advertising and labeling of kosher products. The key to such a regulatory approach would be the religious supervision of the preparation and maintenance of products. The regulation could require those who advertise food products as "kosher" to disclose the basis on which the use of that characterization rests. Many kosher food purveyors would comply by imprinting the symbol of one of the recognized private agencies

that supervise kosher compliance (*e.g.,* "U" for the Union of Orthodox Jewish Congregations of America). Other kosher establishments could comply with a disclosure requirement by indicating other forms of rabbinical supervision. Such an approach would thus make use of the kosher foods industry's existing scheme of self-regulation. *See, e.g.,* 243 *N.J.Super.* at 248 n. 15, 579 *A.*2d 316.

The enforceability of such regulations would inhere in the notion that they simply would "compel [the merchant] to perform a secular obligation to which he contractually bound himself" by virtue of the fact that merchant represents food as being kosher. *Avitzur, supra,* 459 *N.Y.S.*2d at 575, 446 *N.E.*2d at 138. Just as the State may bar promotion of products as having been tested by a certain testing laboratory when they have not been so tested, and just as the State may bar promotion of products as having been endorsed by a certain consumer magazine when they have not been so endorsed, so may the State bar promotion of products as having been prepared under the supervision of a particular rabbi or group of rabbis when they have not been so prepared. Such a consumer protection law would be based on neutral, secular principles, and would be perfectly compatible with the constitutional strictures against governmental establishment of religion.

The regulations at issue, unfortunately, are not limited to such less intrusive means to protect consumers of kosher foods. As they now stand, the regulations plainly violate constitutional standards. We therefore invalidate those portions of the regulations that impose substantive religious standards for the actual preparation and maintenance of kosher food. We do not invalidate the regulations to the extent that they may require the full and accurate disclosure by kosher establishments of the basis on which they advertise and sell their products as "kosher."

We reverse the judgment of the Appellate Division and remand the matter to the trial court for the dismissal of the

State's consumer fraud complaint. We also remand to the Division of Consumer Affairs for the expeditious reformulation of the regulations in a manner consistent with this opinion. *See Texter v. Department of Human Servs.*, 88 *N.J.* 376, 443 *A.*2d 178 (1982).

STEIN, J., dissenting.

The Court today holds that New Jersey's regulations preventing consumer fraud in the sale of kosher products are facially unconstitutional. The determination whether either the church or the State has intruded impermissibly "into the precincts of the other," *Lemon v. Kurtzman*, 403 *U.S.* 602, 614, 91 *S.Ct.* 2105, 2112, 29 *L.Ed.*2d 745, 756 (1971), is profoundly important and often exceedingly difficult. The danger we seek to avoid stems from the belief that "a union of government and religion tends to destroy government and degrade religion." *Engel v. Vitale*, 370 *U.S.* 421, 431, 82 *S.Ct.* 1261, 1267, 8 *L.Ed.*2d 601, 608 (1962). I commend and share the Court's concern for avoiding even the slightest fissure in the constitutional barrier separating church and State. Here, however, the Court goes too far in finding New Jersey's kosher regulations facially invalid. The Court reaches that conclusion through a strained and technical analysis of the Establishment Clause, ignoring case law and the record before us. It is the first State court to overturn such regulations.

Rather than assisting religion, the regulations reflect the State's strong secular interest in preventing consumer fraud in the sale and marketing of kosher-food products. Although the majority relies heavily on variant interpretations of nuances in kosher observance, the facial challenge here simply is unrelated to the esoteric disputes that have intrigued talmudic scholars over the centuries. I discern no constitutional prohibition against enforcing the regulations when enforcement entails straightforward, objective, factual inquiries that focus primarily not on whether the supplier of the food complied strictly with the detailed requirements of kosher-food preparation but rather

on whether the merchant or service establishment has relied in good faith on representations by the supplier that the food has been properly prepared.

The Court reaches its conclusion absent any showing that the regulations are motivated solely by a religious purpose, that enforcement necessarily involves the State in furthering a religion, or that enforcing the regulations entangles the State in religious matters. The majority's reasoning rests substantially on two contentions: that there is considerable disagreement over the meaning of "kosher," and that the administrative scheme confers civil authority on religious persons or entities. The language of the regulations and the record before us, however, do not support those conclusions. Plaintiffs have not produced evidence demonstrating either that agreement over the standards for kosher-food preparation is generally lacking or that the extent of disagreement about the meaning of "kosher" is so substantial as to render all enforcement actions invalid. Further, the majority ignores the longstanding and established precedent recognizing that "kosher" has a meaning in the trade sufficiently well-developed to permit enforcement of kosher regulations. If that standard defines "kosher" in most instances, the regulations may be enforced by referring only to objective and, therefore, secular criteria. Consequently, the regulations do not require the State to make religious determinations.

In addition, the regulations do not require enforcement personnel to be members of the clergy. Nor do they require any religious body to be involved in enforcement matters. The terms of the regulations do not even provide for the Advisory Committee referred to by the majority opinion. Thus, the regulations do not confer governmental power on religious personnel. Because I conclude that the regulations may be constitutionally enforced when they entail application of objective, uniform criteria to identify and address instances of consumer fraud in kosher products, I cannot agree that the regulations are facially invalid.

I

The facial challenge before the Court arose from an enforcement action brought by the Attorney General against Ran-Dav's County Kosher, Inc. (County Kosher), alleging violations of several provisions of New Jersey's regulations governing the preparation, maintenance, and sale of kosher products. See *N.J.A.C.* 13:45A–21.1 to –21.7, *N.J.A.C.* 13:45A–22.1 to –22.3 (the regulations). County Kosher challenged the regulations' constitutionality in its affirmative defenses and counterclaims to the enforcement action. The trial court, after hearing oral argument, denied the parties' respective requests for injunctive relief and determined that the Appellate Division, not the trial court, was the proper forum for County Kosher's constitutional challenge. A divided panel of the Appellate Division upheld the regulation. 243 *N.J.Super.* 232, 579 *A.*2d 316 (1991).

The sole issue before us is whether the regulations are facially unconstitutional. No record has been developed regarding the factual disputes involved in the underlying enforcement action, nor has any fact-finding been conducted. We therefore need not and cannot determine whether the regulations would withstand an as-applied challenge.

Preliminarily, we note that the abbreviated record generated by virtue of the facial challenge presented may have misled the majority in its perception and characterization of the regulatory scheme as one that regulates the "antecedent preparation and maintenance" of kosher products. *Ante* at 155. That characterization is simply incorrect. The regulations virtually ignore the technical rules and procedures involved in the preparation of kosher products, omitting for example any reference to so basic an element of kashrut as the method of slaughter. Rather, the regulatory approach appears to focus not on whether the slaughterhouse or manufacturer properly observed generally-accepted principles in preparing the kosher-food products but on whether the distributor of the food obtained adequate written verification from its suppliers that the food had been

properly prepared. In that connection, the regulations contain a so-called "Exculpatory section," *N.J.A.C.* 13:45A–21.7, providing that no establishment selling or serving food shall have "committed an unlawful practice" if it relied in good faith on representations of a slaughterhouse, manufacturer, processor, packer, or distributor that the food had been prepared in accordance with established standards.

Accordingly, the regulations concentrate on whether those engaged in the sale or service of kosher-food products have complied with the display and handling requirements, *N.J.A.C.* 13:45A–21.3, mandating separation of kosher and non-kosher foods, appropriate internal signage in display cabinets, use of separate utensils for meat and dairy products, and display of tags on meat products verifying that washing and deveining standards had been met. The regulations also mandate that all kosher meat and poultry offered for sale contain identification tags that had been affixed by the slaughterhouse on designated parts of meat and poultry disclosing the identity of the slaughterhouse, the date of slaughter, and the name of the person who had sanctioned the slaughter. *N.J.A.C.* 13:45A–21.1; 13:45A–21.4. Even the Violation Report form reproduced in the record, the use of which has apparently been discontinued, reveals that the enforcement of the regulations focuses almost exclusively on display, labeling, and signage, as well as on misrepresentation of food products as kosher. To the extent that we are informed by the regulations and by the truncated record, the regulatory function—contrary to the majority's characterization—involves primarily verification of objective and uncontroverted requirements, rather than the highly-technical supervision of the slaughtering and preparation of kosher food.

The record contains minimal evidence regarding whether the regulations' reference to Orthodox Judaism imposes a religious standard or whether it refers, in most instances, to a uniform, objective, and therefore secular standard for kosher-food processing. To the extent disagreement exists regarding the defi-

nition of "kosher," the record does not indicate whether the areas of disagreement are so substantial as to render enforcement constitutionally infirm in all or substantially all instances. Contrary to the majority's contention that the record indicates "considerable disagreement over what precepts or tenets truly represent the laws of Kashrut," *ante* at 147, the only reference to that purportedly-broad disagreement is found in an array of articles from various sources attached to the parties' briefs. For example, the parties have submitted several newspaper articles that allude to disagreements among authorities regarding whether particular practices render food kosher. According to other newspaper articles submitted to the court, some authorities believe that a uniform definition of "kosher," derived from Orthodox Judaism, resolves the question whether food is kosher in the vast majority of applications, despite disagreements with respect to fringe issues not raised by most enforcement actions. The parties have offered other articles by various rabbis concerning whether particular foods and food products are kosher. Those articles, however, do not indicate whether those foods are involved in a significant proportion of the State's enforcement actions. Neither do any of the secondary sources surveyed refute the conclusion that widespread agreement exists concerning a significant body of kosher-food-preparation principles.

The record also includes the affidavits of four rabbis, representing each of the four branches of Judaism: Orthodox, Conservative, Reform, and Reconstructionist. Each of those Rabbis attests that his branch of Judaism recognizes Orthodox Judaism as the source of law regarding kosher preparation of food. Although they each acknowledge some measure of disagreement concerning particular food-preparation practices, all maintain that most kosher practices are governed by unitary, acknowledged standards as interpreted by Orthodox Judaism.

Additionally, the record does not establish that the regulations, on their face, require either the involvement of any religious officials or the employment of persons of a particular

religious background in enforcement matters. The regulations do not require that a religious official hold any of the enforcement positions. Although Rabbi Dombroff, the current Chief of Enforcement, is a rabbi, rabbinical training is not required for the job. Indeed, the previous Chief of Enforcement was neither a rabbi or an observant Jew.

Further, the role of the State Kosher Advisory Committee (the Committee) is not at issue in this facial challenge because the Committee was established by Executive Order; the regulations do not provide for or refer to such a committee. Even if the Committee's role was at issue, the parties present no evidence of any specific instance in which the Committee advised enforcement authorities about compliance with the regulations. A deputy attorney general representing the Bureau of Kosher Enforcement (the Bureau) certified that she had had no contact or involvement with the Committee in the two years she had represented the Bureau, and that the Committee had not participated in any of the Bureau's adjudicatory functions.

## II

In considering the constitutional challenge before it, the Court must determine whether the regulations, on their face, violate the First Amendment. As the United States Supreme Court has said, "It has not been the Court's practice, in considering facial challenges to statutes * * * to strike them down in anticipation that particular applications may [produce unconstitutional results]." *Roemer v. Board of Pub. Works*, 426 *U.S.* 736, 761, 96 *S.Ct.* 2337, 2352, 49 *L.Ed.*2d 179, 196 (1976). Accordingly, a statute or regulation may be valid on its face but invalid in a particular application. *See Bowen v. Kendrick*, 487 *U.S.* 589, 601, 108 *S.Ct.* 2562, 2570, 101 *L.Ed.*2d 520, 535 (1988); *Tilton v. Richardson*, 403 *U.S.* 672, 682, 91 *S.Ct.* 2091, 2098, 29 *L.Ed.*2d 790, 801 (1971) ("We cannot, however, strike down an Act of Congress on the basis of a hypothetical 'profile.' "). Thus, a statute or regulation is facially unconstitutional only if

the constitution is necessarily violated every time the law is enforced. *See Committee for Pub. Educ. & Religious Liberty v. Nyquist,* 413 *U.S.* 756, 779–80, 93 *S.Ct.* 2955, 2968–69, 37 *L.Ed.*2d 948, 967 (1973) (holding statutes providing maintenance and repair benefits to private schools facially invalid because of inevitable effect of subsidizing religious mission of sectarian schools). That comports with the settled notion that a regulation or statute will be construed to avoid constitutional defects if it is reasonably susceptible of such a construction. *New Jersey Bd. of Higher Educ. v. Board of Directors,* 90 *N.J.* 470, 478, 448 *A.*2d 988 (1982); *State v. Profaci,* 56 *N.J.* 346, 350, 266 *A.*2d 579 (1970).

In considering whether governmental regulation of consumer fraud in the sale of kosher foods violates the First Amendment, we note that

[i]n every Establishment Clause case, we must reconcile the inescapable tension between the objective of preventing unnecessary intrusion of either the church or the state upon the other, and the reality that, as the Court has so often noted, total separation of the two is not possible.

[*Lynch v. Donnelly,* 465 *U.S.* 668, 672, 104 *S.Ct.* 1355, 1359, 79 *L.Ed.*2d 604, 609 (1984).]

We are guided by the principle that the Constitution does not "require complete separation of church and state; it affirmatively mandates accommodation, not merely tolerance, of all religions, and forbids hostility toward any." *Id.* at 673, 104 *S.Ct.* at 1359, 79 *L.Ed.*2d at 610. Because the United States Supreme Court "consistently has declined to take a rigid, absolutist view of the Establishment Clause," our analysis under this test must entail a careful balancing of all the circumstances. *Id.* at 678–79, 104 *S.Ct.* at 1361, 79 *L.Ed.*2d at 613.

To evaluate County Kosher's facial challenge to the regulations on Establishment Clause grounds, this Court must apply the standard first articulated in *Lemon, supra,* 403 *U.S.* 602, 91 *S.Ct.* 2105, 29 *L.Ed.*2d 745. I note initially that the regulations need not be subjected to a strict-scrutiny analysis as articulated in *Larson v. Valente,* 456 *U.S.* 228, 102 *S.Ct.* 1673, 72 *L.Ed.*2d 33 (1982), because they do not discriminate among different

religions or religious sects. Therefore, under the three-pronged *Lemon* test, the regulations would be invalid under the Establishment Clause "only if [they are] motivated wholly by an impermissible purpose, if [their] primary effect is the advancement of religion, or if [they] require[ ] excessive entanglement between church and state." *Bowen, supra*, 487 *U.S.* at 602, 108 *S.Ct.* at 2570, 101 *L.Ed.*2d at 536 (citations omitted); *see also Lemon, supra*, 403 *U.S.* at 612–13, 91 *S.Ct.* at 2111, 29 *L.Ed.*2d at 755 (setting forth three-pronged test).

The first prong of the *Lemon* test evaluates whether the regulations were motivated by a religious purpose. *Id.* at 612, 91 *S.Ct.* at 2111, 29 *L.Ed.*2d at 755; *Lynch, supra*, 465 *U.S.* at 679–80, 104 *S.Ct.* at 1362–63, 79 *L.Ed.*2d at 613–14. In order to invalidate state action under this prong, the religious purpose must predominate. *Edwards v. Aguillard*, 482 *U.S.* 578, 599, 107 *S.Ct.* 2573, 2585–86, 96 *L.Ed.*2d 510, 529 (1987) (Powell, J., concurring); *Wallace v. Jaffree*, 472 *U.S.* 38, 56, 105 *S.Ct.* 2479, 2489–90, 86 *L.Ed.*2d 29, 43 (1985). Even in the face of substantial benefits to religion, governmental action has been held to be consistent with the Establishment Clause where motivated by a secular purpose. *Lynch, supra*, 465 *U.S.* at 680, 104 *S.Ct.* at 1362–63, 79 *L.Ed.*2d at 614; *see Board of Educ. v. Allen*, 392 *U.S.* 236, 88 *S.Ct.* 1923, 20 *L.Ed.*2d 1060 (1968) (upholding statute that required local public school authorities to lend textbooks free of charge to children in private parochial schools); *Everson v. Board of Educ.*, 330 *U.S.* 1, 7, 18, 67 *S.Ct.* 504, 507, 513, 91 *L.Ed.* 711, 719, 725 (1947) (upholding statute that authorized reimbursement to parents for monies expended for their children's bus transportation to parochial school).

Here, the regulations serve the secular purpose of protecting consumers from fraud in the sale of kosher food. As we were informed at oral argument, the kosher-food industry involves a vast commercial market, representing approximately $1.5 billion in sales annually. The industry is particularly susceptible to fraud because consumers cannot readily discern whether food has been prepared in compliance with kosher laws; thus

non-kosher food products can easily be represented to be kosher. The Division of Consumer Affairs' statement accompanying the proposed regulations underscores the Division's intent to protect consumers from misrepresentation of kosher products, regardless of whether the consumer purchased the goods for religious or other reasons:

> The proposed new rules make it unlawful for any establishment engaged in the sale of food or food products to sell, offer for sale, serve or possess with intent to sell, any food [that] is falsely represented as Kosher.
>
>    *     *     *     *     *     *     *     *
>
> * * * These rules make it illegal to falsely represent foods as Kosher or Kosher for Passover and thus protect the consumer who, for reasons of religion, conscience, quality or health, intends to purchase Kosher foods.
>
> [16 *N.J.R.* 220 (Feb. 6, 1984).]

The parties do not contest either the State's power to promulgate regulations to protect consumers or the secular nature of that power. Indeed, the majority concedes that "the objective of the regulation is to protect against fraudulent sales." *Ante* at 166.

. The regulations retain their valid secular purpose despite their incorporation of a religious definition. *Cf. People v. Atlas,* 183 *A.D.* 595, 170 *N.Y.S.* 834, 835 (App.Div.1918), *aff'd,* 230 *N.Y.* 629, 130 *N.E.* 921 (1921) (recognizing that purpose of New York's kosher law, to prevent fraud, is within the Legislature's general police power). The mere reference to religion need not render a statute or regulation facially unconstitutional. For example, the Humane Slaughter Act, 7 *U.S.C.* §§ 1901–1906, withstood an establishment clause challenge although it includes within its definition of humane, "slaughtering in accordance with the ritual requirements of the Jewish faith." *See Jones v. Butz,* 374 *F.Supp.* 1284 (S.D.N.Y.), *aff'd,* 419 *U.S.* 806, 95 *S.Ct.* 22, 42 *L.Ed.*2d 36 (1974). There, the court found a secular legislative purpose in that Congress intended "to establish humane standards for the slaughter of livestock." *Id.* at 1293. It concluded that the fact that the Act's provision "defining humaneness coincided with the method of Jewish ritual slaughter * * * neither advanced nor inhibited religion."

*Ibid.* Similarly, here the regulations refer to a religious definition in order to serve a valid secular purpose of eliminating consumer fraud. Therefore, incorporating Orthodox Jewish standards does not undermine the regulations' secular purpose.

Further, even if the regulations had been intended in part to accommodate the religious practice of a particular group, they need not be invalidated. The "purpose" prong "does not mean that the law's purpose must be unrelated to religion." *Corporation of the Presiding Bishop v. Amos,* 483 *U.S.* 327, 335, 107 *S.Ct.* 2862, 2868, 97 *L.Ed.*2d 273, 282 (1987). The State may respect "the religious nature of our people and accommodate[ ] the public service to their spiritual needs." *Zorach v. Clauson,* 343 *U.S.* 306, 314, 72 *S.Ct.* 679, 684, 96 *L.Ed.* 954, 962 (1952). Accordingly, even if the regulations had been designed in part to accommodate consumers who purchase kosher food for religious reasons, they would not violate the "purpose" prong because the regulations nevertheless serve the secular purpose of protecting both religious and non-religious consumers from fraud.

The second prong of the *Lemon* test provides that the regulations' principal or primary effect must neither advance nor inhibit religion. *Lemon, supra,* 403 *U.S.* at 612, 91 *S.Ct.* at 2111, 29 *L.Ed.*2d at 755. In evaluating the effect of governmental conduct under the Establishment Clause, we must determine whether "the challenged governmental action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices." *Allegheny County v. ACLU,* 492 *U.S.* 573, 597, 109 *S.Ct.* 3086, 3103, 106 *L.Ed.*2d 472, 497 (1989) (quoting *Grand Rapids v. Ball,* 473 *U.S.* 373, 390, 105 *S.Ct.* 3216, 3226, 87 *L.Ed.*2d 267, 281 (1985)). Thus, even if some advancement of religion will result from governmental action, there is no impermissible effect if the "reason or effect merely happens to c⁓incide or harmonize with the tenets of some * * * religion[ ]." *Lynch, supra,* 465 *U.S.* at 682, 104 *S.Ct.* at 1364, 79 *L.Ed.*2d at 616 (quoting *McGowan*

*v. Maryland,* 366 *U.S.* 420, 442, 81 *S.Ct.* 1101, 1113, 6 *L.Ed.*2d 393, 408 (1961)).

The context of the religious reference or symbol is therefore critical in determining whether governmental action has an impermissible effect. *Allegheny, supra,* 492 *U.S.* at 595–98, 109 *S.Ct.* at 3102–04, 106 *L.Ed.*2d at 496–98. Explicitly-religious references may consequently be permissible in a context that conveys a secular message and does not communicate an endorsement of any particular religion. *See Id.* at 618–20, 109 *S.Ct.* at 3114–15, 106 *L.Ed.*2d at 510–11 (holding that menorah included in holiday display along with other secular holiday symbols created no impermissible effect); *Bowen, supra,* 487 *U.S.* at 604–15, 108 *S.Ct.* at 2571–78, 101 *L.Ed.*2d at 537–44 (holding that statute providing funding for services relating to adolescent sexuality and pregnancy, which expressly encouraged federally-supported services to promote the involvement of religious organizations, had no impermissible effect); *Lynch, supra,* 465 *U.S.* at 671, 681–83, 104 *S.Ct.* at 1358, 1363–64, 79 *L.Ed.*2d at 608–09, 615–16 (holding that creche containing both secular and religious representations had no impermissible effect).

I conclude that the regulations prohibiting consumer fraud in the sale of kosher products do not have the impermissible effect of advancing religion. No showing has been made that the State's enforcement will be perceived as endorsing Orthodox Judaism or as disapproving other religious choices. Enforcement does not encourage consumers to purchase kosher food, nor does it encourage merchants to sell kosher food. Further, because the regulations on their face authorize factual inquiries in order objectively to apply non-disputed kosher principles, the State is not forcing compliance with a particular religious interpretation; rather, it enforces unitary standards that do not favor a particular religion or religious sect.

The regulations' reference to Orthodox Judaism must be considered in the context of a regulatory scheme focused on

protecting all consumers of kosher products. As the majority acknowledges, "[t]he false promotion of non-kosher foods harms a variety of consumers" including members of other religions, people with particular health problems, and others who believe kosher meat is superior because it is prepared under close supervision. *Ante* at 148. The representation that fewer than one-third of the consumers of kosher products are Jewish indicates that the regulations have the effect of protecting a broad group of consumers, not just persons of a particular religion or religious sect. Therefore, enforcement provides no direct support to any particular religious organization. Thus, the regulations do not have an impermissible effect merely because they incorporate a religious reference.

Furthermore, the reference to Orthodox Judaism does not advance a religion by identifying the State with a religion or by creating a symbolic union of government and religion. *See Grand Rapids, supra,* 473 *U.S.* at 389, 105 *S.Ct.* at 3225–26, 87 *L.Ed.*2d at 281. The majority reasons that such an identification is fostered by the fact that the Chief of the Bureau of Kosher Enforcement and the members of the Advisory Committee are rabbis, and because "those individuals are being used by and for the State in their religious capacity to interpret and enforce state law." *Ante* at 164. That assertion ignores the fact that the regulations, on their face, do not require either the Chief or the inspectors to be rabbis or even to be Jewish. Significantly, the Chief of Enforcement who preceded Rabbi Dombroff was not a rabbi or an observant Jew, and one of the current inspectors is not Jewish. Rabbi Dombroff's role here might be more relevant to an as-applied than to a facial challenge. Even in that context, however, that the current Chief of Enforcement happens to be a rabbi cannot be said impermissibly to confer civil authority on a religious person.

Moreover, the regulations themselves do not mention the creation, existence, use, or composition of the Advisory Committee. Putting aside the paucity of evidence regarding the Committee's actual involvement in enforcing the regulations, the

Committee is simply not relevant to this facial challenge because it is not referred to within the regulations. Even in an as-applied context, the record does not establish that the Committee has exercised governmental power. The record contains no evidence of a single instance in which the Committee had been consulted or in which it advised the Chief of Enforcement regarding compliance. The sole evidence in the record of the Committee's involvement is one comment purportedly made by Rabbi Dombroff to County Kosher's attorney that he consulted with the Committee "when h[e] felt it necessary." The regulations, therefore, do not require or provide for the intervention of any religious personnel. On their face, then, the regulations do not identify the State with a particular religion, nor do they have the effect of furthering establishment of a religion in violation of the First Amendment.

Under the third prong of the *Lemon* standard, government action "must not foster 'an excessive government entanglement with religion' " in order to withstand an establishment-clause challenge. *Lemon, supra,* 403 *U.S.* at 613, 91 *S.Ct.* at 2111, 29 *L.Ed.*2d at 755 (quoting *Walz v. Tax Comm'n,* 397 *U.S.* 664, 674, 90 *S.Ct.* 1409, 1414, 25 *L.Ed.*2d 697, 704 (1970)). In applying that test we note that "[t]here is no exact science in gauging the entanglement of church and state," and emphasize that it is *"excessive* entanglement" that is prohibited. *Roemer, supra,* 426 *U.S.* at 766, 96 *S.Ct.* at 2354, 49 *L.Ed.*2d at 199.

The majority determines that the regulations foster excessive entanglement because they "impose substantive religious standards," *ante* at 154, and "authorize[ ] the State to monitor the adherence to those standards." *Ante* at 155. However, as discussed *supra* at 146–48, the regulations focus primarily on whether kosher foods offered for sale comply with the various display, identification, and verification requirements; they do not address other aspects of kosher-food preparation, such as the requisite method of slaughtering animals or poultry. Accordingly, the regulations appear to contemplate a relatively unintrusive form of monitoring that attempts to limit the evalu-

ation to objective rather than religious judgments. Thus, the inspection of a kosher-food establishment's compliance with the regulations involves a routine and objective inquiry concerning whether, for example, the food offered for sale is displayed as either kosher or non-kosher, whether kosher and non-kosher foods are separated, whether identification tags are affixed to the respective parts of kosher meats, and whether the tags on meats indicate that they had been washed and deveined. That an inspector requires no religious training or background to perform those functions is self-evident. The inquiry is essentially the same as that conducted by an inspector evaluating compliance with health and safety regulations. Therefore, rather than policing the "religious purity" of kosher food, the State, through the regulations, merely enforces another of its consumer codes.

The majority also reasons that the regulations foster excessive entanglement because of "differences of opinion * * * with respect to the laws of kashrut." *Ante* at 159. Concededly, some religious scholars may disagree over nuances of kosher-food-preparation standards. However, those disagreements are not implicated by the objective regulations at issue here. Even if they were relevant, neither the record nor the secondary sources surveyed establish that those disputes are so pervasive and substantial as to engender a dispute over religious doctrine in the routine enforcement actions contemplated by the regulations. See *supra* at 172–174. That secondary sources may inform the Court concerning background questions relevant to the litigation before it does not sanction their use by the majority as substantive evidence of central issues vigorously disputed by the parties. *Cf. Allegheny, supra,* 492 *U.S.* at 614 n. 60, 109 *S.Ct.* at 3112 n. 60, 106 *L.Ed.*2d at 507–08 n. 60 (discussing use of secondary sources). Further, disputes over the various "shades of observance" or of the true nature of Judaism are not germane to our inquiry because they advert to personal choices concerning religious beliefs, not to the stan-

dards for preparation of kosher foods on which a broad range of consumers rely.

Plaintiffs assert that no unitary standard exists for determining whether food is kosher. The only documents in the record supporting that claim are a number of newspaper articles, which are not admissible as evidence of the facts stated therein. *State v. Otis Elevator Co.*, 10 *N.J.* 504, 509, 92 *A.*2d 385 (1952); *Samuel Sheitelman, Inc. v. Hoffman*, 106 *N.J.Super.* 353, 356, 255 *A.*2d 807 (App.Div.1969). The record does not reflect that any party requested the Appellate Division or this Court to take judicial notice of any of the articles submitted or of any facts that they recite. *Evid.R.* 9(3). Had such a request been made, the articles surely would not have been appropriate subjects for judicial notice because they address matters sharply disputed in this case. *See Evid.R.* 9(2); *Essex County Div. of Welfare v. Harris*, 189 *N.J.Super.* 479, 481–82, 460 *A.*2d 713 (App.Div. 1983). In contrast, the affidavits of rabbis representing each branch of Judaism assert that each branch recognizes Orthodox Judaism as the source of kosher law, and maintain that most kosher practices are governed by unitary principles.

In addition, the conclusion that the regulations are entirely religious contradicts the long-established holdings of many courts, including the United States Supreme Court, that references to Judaism in kosher regulations refer to sufficiently definite and objective standards capable of enforcement by courts when there is no disagreement among religious authorities about whether a particular food is kosher. For example, the United States Supreme Court recognized that a similar New York statute providing consumer protection for kosher foods was not unconstitutionally vague. The Court noted that "the evidence, while conflicting, warrants the conclusion that the term 'kosher' has a meaning well-enough defined to enable one engaged in the trade to correctly apply it; at least, as a general thing." *Hygrade Provision Co. v. Sherman*, 266 *U.S.* 497, 502, 45 *S.Ct.* 141, 142, 69 *L.Ed.* 402, 407 (1925). Similarly, in

discussing the validity of the New York statute, one court noted that

> [i]t is manifest, however, that the Legislature did not intend to use the word "kosher" in an indefinite sense, but evidently in the ordinary sense in which it is used in the trade, which is to designate meat as having been prepared under and of a product sanctioned by said religious requirements, and, therefore, as I view it, the Legislature has itself definitely defined the word "kosher" as used in the statute. This construction leaves the statute sufficiently definite * * *.
>
> [*Atlas, supra,* 170 *N.Y.S.* at 835–36.]

*See also National Foods, Inc. v. Rubin,* 727 *F.Supp.* 104, 109 (S.D.N.Y.1989) (acknowledging long-standing recognition of constitutionality of New York's kosher laws); *People v. Goldberger,* 163 *N.Y.S.* 663 (Ct.Spec.Sess.1916) (upholding constitutionality of New York's kosher regulation). Indeed, courts have not refrained from enforcing New York's kosher laws. *See, e.g., Cohen v. Eisenberg,* 173 *Misc.* 1089, 19 *N.Y.S.*2d 678 (Sup.Ct.), *aff'd,* 260 *A.D.* 1014, 24 *N.Y.S.*2d 1004 (App.Div.1940); *People v. Gordon,* 172 *Misc.* 543, 14 *N.Y.S.*2d 333 (Ct.Spec.Sess. 1939), *rev'd on other grounds,* 258 *A.D.* 421, 16 *N.Y.S.*2d 833 (App.Div.), *aff'd,* 283 *N.Y.* 705, 28 *N.E.*2d 717 (1940).

Other courts have similarly recognized that kosher regulations refer to sufficiently definite and secular standards to warrant enforcement. For example, Maryland's highest court recently upheld the validity of Baltimore's city-code provision regulating the sale of kosher foods under Maryland's state constitution, noting that "[f]actors that make particular items fit for consumption under these dietary strictures can be complex, but the overwhelming majority of these laws are well settled and not subject to dispute." *Barghout v. Mayor & City Council,* 325 *Md.* 311, 600 *A.*2d 841, 847 (1992); *see also Erlich v. Municipal Court,* 55 *Cal.*2d 553, 11 *Cal.Rptr.* 758, 360 *P.*2d 334 (1961) (upholding California statute regulating fraud in sale of kosher food as sufficiently definite and referring to generally-recognized laws and customs); *Sossin Systems, Inc. v. City of Miami Beach,* 262 *So.*2d 28, 30 (Fla.Dist.Ct.App.1972) (Miami Beach ordinance regulating sale of kosher food does not violate Establishment Clause; rather it "serves to safeguard the ob-

servance of [religious] tenets."); 52 *A.L.R.*3d 959 § 2 (1973) (noting that courts have generally upheld statutes and ordinances prohibiting misrepresentation in marketing of kosher food against various constitutional challenges).

In addition, the wide spectrum of consumers who apparently rely on representations that food products are kosher underscores the diminishing religious nature of the kosher designation. *Cf. Marsh v. Chambers,* 463 *U.S.* 783, 792, 103 *S.Ct.* 3330, 3336, 77 *L.Ed.*2d 1019, 1028 (1983) (recognizing that legislative prayer "has become part of the fabric of our society" in light of unambiguous and unbroken history of use); *McGowan, supra,* 366 *U.S.* at 431–38, 444, 81 *S.Ct.* at 1108–12, 1114–15, 6 *L.Ed.*2d at 402–06, 410 (considering whether legislation lost its religious character in order to adjudicate constitutionality of Sunday-closing laws); Laurence H. Tribe, *American Constitutional Law,* § 14–15, at 1294 (2d ed. 1988) (noting that "[c]learly, practices can outgrow their religious roots * * *."). Even if religious in origin, the kosher designation serves an increasingly secular role in our society. Thus, to the extent the New Jersey regulations refer to commercially-recognized and sufficiently-definite standards, they are facially valid and do not enmesh the State in monitoring religious practices.

The majority contends that the religious qualifications of the persons selected to enforce the regulations further evidences their sectarian nature. *Ante* at 156. As discussed, *supra* at 156–57, the regulations neither require the Chief of the Bureau of Enforcement to be a rabbi nor provide for an Advisory Committee. Thus, unlike either *Larkin v. Grendel's Den,* 459 *U.S.* 116, 125–27, 103 *S.Ct.* 505, 511–12, 74 *L.Ed.*2d 297, 306–08 (1982), or *Spacco v. Bridgewater School Dep't,* 722 *F.Supp.* 834, 844–47 (D.Mass.1989), the Chief Enforcer and the Committee have not been invested with the authority to determine or control secular matters. Therefore, the regulations, on their face, do not confer impermissible power on religious persons or bodies.

The majority additionally finds that all disputes "would call inescapably on the State to assume a religious role" and "inevitably would entail the application and interpretation of Jewish law." *Ante* at 162–63. Although instances may arise in which enforcement actions could involve religious principles, perhaps resulting in an "as applied" challenge to the regulations, the majority ignores the practical reality that the vast majority of inspections and enforcement proceedings authorized by the regulations will involve application of only objective standards. Noting that aspect of enforcement of kosher laws, one district court recently rejected a claim that an enforcement action pursuant to New York's kosher statute violated the Establishment Clause precisely because

> [n]o facts are alleged in the amended complaint that suggest a theological dispute or the enforcement of one form of religious orthodoxy over another. Hebrew National's amended complaint alleges no facts showing that the 1987 sanction or the 1989 investigation is based on a theological disagreement. * * * Thus, the facts alleged in the amended complaint do not state a claim of violation of the establishment clause.

> [*National Foods, supra,* 727 *F.Supp.* at 109.]

*See also Korn v. Rabbinical Council,* 148 *Cal.App.*3d 491, 195 *Cal.Rptr.* 910, 914 (1983) (determining that court has jurisdiction "if, after the application of traditional Judaic law to the facts surrounding the preparation of the specific food in question, Jewish religious authorities do not dispute the characterization of the food as kosher").

Similarly, whether County Kosher violated the regulations in the underlying enforcement action may be resolved for the most part purely by factual determinations, involving no religious disputes whatsoever. For example, the allegation that County Kosher was storing admittedly non-kosher chicken in its shop can be resolved without any reference to religious doctrine. The record is devoid of evidence to support the conclusion that by enforcing the regulations to identify fraudulent representation of kosher foods, the State necessarily interprets religious law or applies religious principles.

When no religious issues are involved, or when kosher law is settled, the regulations may be enforced by reference to neutral principles of law. *See Jones v. Wolf,* 443 *U.S.* 595, 602–04, 99 *S.Ct.* 3020, 3024–26, 61 *L.Ed.*2d 775, 784–85 (1979); *Serbian Eastern Orthodox Diocese v. Milivojevich,* 426 *U.S.* 696, 708–17, 96 *S.Ct.* 2372, 2380–84, 49 *L.Ed.*2d 151, 162–67 (1976); *Presbyterian Church v. Mary Elizabeth Blue Hull Memorial Presbyterian Church,* 393 *U.S.* 440, 449, 89 *S.Ct.* 601, 606, 21 *L.Ed.*2d 658, 665 (1969); *Elmora Hebrew Ctr. v. Fishman,* 125 *N.J.* 404, 413–16, 593 *A.*2d 725 (1989). As the New York Court of Appeals recognized in a case concerning the enforcement of a Ketubah, a Jewish document that formed the basis for a marriage, the fact that the subject matter of the dispute "[was] grounded in religious belief and practice does not preclude enforcement of its secular terms." *Avitzur v. Avitzur,* 58 *N.Y.*2d 108, 459 *N.Y.S.*2d 572, 575, 446 *N.E.*2d 136, 139, *cert. denied,* 464 *U.S.* 817, 104 *S.Ct.* 76, 78 *L.Ed.*2d 88 (1983). Similarly, the State may neutrally enforce its consumer-protection laws regarding kosher food in the same manner as the State protects consumers of other goods. Thus, although an "as-applied" challenge to the regulations may be brought when a particular enforcement action raises questions concerning the proper interpretation of kosher law, *Market St. Mission v. Bureau of Rooming and Boarding House Standards,* 110 *N.J.* 335, 343–44, 541 *A.*2d 668, *appeal dismissed,* 488 *U.S.* 882, 109 *S.Ct.* 209, 102 *L.Ed.*2d 201 (1988), the regulations are facially valid to the degree that they may be applied neutrally, without involving the State in religious matters. In assuming that all disputes would entail application of Jewish law, *ante* at 162–63, the majority remains preoccupied with those isolated, debatable aspects of kosher-food preparation that may be of theoretical interest to religious scholars, but have virtually nothing to do with this facial challenge.

No evidence before us indicates that any of the prongs of the *Lemon* test will necessarily be violated by enforcement of the

regulations. Therefore, I cannot agree that the regulations, on their face, violate the Establishment Clause.

### III

Because there is no indication that every enforcement action engenders a First Amendment violation, I find no basis on which to conclude that the regulations are facially invalid. Absent a showing that no unitary kosher standard exists or that the religious disagreements over kashrut are so predominant as to arise in each application, the regulations should not be invalidated.

At oral argument, the Attorney General indicated that the regulations were currently undergoing revisions. I would encourage the Attorney General to take advantage of the suggestions presented at oral argument and to consider alternative formulations in order to render the regulations and their enforcement as neutral as possible. On this record, however, I conclude that the regulations have not been shown to be facially invalid.

*For reversal and remandment*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK—4.

For *Affirmance*—Justice O'HERN, GARIBALDI, STEIN—3.